Argued and submitted April 6, dismissed December 28, 1983

In re Complaint as to the Conduct of
# STANLEY M. SAMUELS and
# DAVID P. WEINER,
*Accuseds.*

(NO 80-83; SC 29211)

674 P2d 1166

_____

Carl R. Neil, Portland, argued the cause for the accuseds. With him on the briefs were Daniel H. Skerritt and Lindsay, Hart, Neil, and Weigler, Portland.

John S. Ransom, Portland, argued the cause for the Oregon State Bar. With him on the brief were Ransom, Blackman and Simson, Portland.

Before Lent, Chief Justice*, Peterson**, Campbell, Roberts, Carson and Jones, Justices.

PER CURIAM

* Chief Justice when case argued.

** Chief Justice when decision rendered.

## PER CURIAM

In this combined disciplinary proceeding,[1] the Oregon State Bar, in two separate complaints, charged the accuseds, respectively, with substantially the same acts in violation of part of Canon 5 of the Code of Professional Responsibility.[2] The thrust of the four charges against the accuseds is that they failed to exercise independent professional judgment in behalf of a client.

Both the Trial Board and the Disciplinary Review Board found both accuseds not guilty on all four counts. We decide the facts upon the record made before the Trial Board. *In re Drake,* 292 Or 704, 706, 642 P2d 296 (1982).

■ ■ Although we make an independent review of the evidence (*In re Robeson,* 293 Or 610, 629, 652 P2d 336 (1982)), we rely, in part, upon the five-page stipulation executed by the Bar and counsel for the accuseds. To the extent that the credibility of witnesses is a material issue, we place substantial reliance on the findings of fact by the Trial Board. *In re Collier,* 295 Or 320, 327, 667 P2d 481 (1983); *In re J. Kelly Farris,* 229 Or 209, 219, 367 P2d 387 (1961).

### Facts

Samuels, who has been practicing law for 27 years, and Weiner, who has been practicing for 11 years, are partners in a Portland law firm where the primary emphasis of their respective professional practices is in the area of commercial real property transactions. In late 1975 or early 1976, Weiner was instrumental in causing the formation of a partnership, A.P.T.S. Properties (A.P.T.S.). The new partnership had as equal partners three clients of the accuseds' law firm. These clients were Gilbert, Murrell, and a corporation, which was

---

[1] Although the two accuseds generally performed separate roles in the transactions involved in this proceeding, the charges by the Bar are, except as noted, identical and the answers from the accuseds are likewise. We shall treat the accuseds as mutually responsible. *See* DR 5-105(D), relating to vicarious disqualification.

[2] E[thical] C[onsideration] 5-1 states:

"The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client." The Ethical Considerations, American Bar Association Code of Professional Responsibility.

"controlled" by Christensen.[3] All three clients were experienced and licensed real estate brokers. Not only had the accuseds' law firm previously represented each of the new partners, but both of the accuseds previously had invested in real estate with clients Gilbert and Murrell. The partnership, A.P.T.S., filed an assumed business name on February 11, 1976, listing Weiner as the "Authorized Representative." A written partnership agreement, prepared by Weiner, was not executed, however, until May of 1977.

On several occasions, either Samuels or Weiner represented A.P.T.S. in the acquisition of various real properties, including the Fairway Downs Apartments, which was acquired by A.P.T.S. on July 1, 1976. In October of 1976, Samuels met with the partners and their accountant for the purpose of discussing a proposed sale by A.P.T.S. of a 60% interest in the Fairway Downs Apartments, which sale was labeled a "syndication." Following the meeting, Samuels prepared the Terms of Sale document for the sale of a 60% interest in the Fairway Downs Apartments. The partners had advised Samuels that each of the partners would be responsible for bringing in one-third of the new investors. At some point during the preparation of the Terms of Sale document, Gilbert offered participation to Samuels and Weiner as investors, on the same terms as any other investor. In December of 1976, Samuels wrote to A.P.T.S., enclosing the Terms of Sale documents, and stating that several members of the law firm probably would be investors in the new venture. In fact, two members of the firm did invest — Samuels and Weiner. After the Terms of Sale documents had been sent to A.P.T.S., the partners caused 13 new investors, including the accuseds, to execute various copies of the documents. Upon reviewing the executed Terms of Sale documents, the accuseds first learned who the other new investors were in the venture and, also, that at least two investors had been, and one still was, represented by the law firm.

The new entity, F-D Apartments Joint Venture,[4] then acquired a 60% interest in the Fairway. Downs

---

[3] According to the testimony and exhibits, Christensen was president of the corporation, guaranteed its obligations to A.P.T.S., and was characterized in a document prepared by the accuseds as the one who "controlled" the corporation.

[4] Throughout this proceeding, the characterization and titles of the business entities involved herein have caused the litigants and the lower tribunals considerable

Apartments. In December, 1976, Samuels prepared the assignment of the 60% interest to F-D Apartments Joint Venture from A.P.T.S. In early 1977, Weiner drafted proposed forms of joint venture agreements for F-D Apartments Joint Venture and for Fairway Downs Joint Venture, an umbrella joint venture composed of A.P.T.S. (40%) and F-D Apartments Joint Venture (60%). On March 17, 1977, a meeting of the participants in the two joint ventures was held. This was the first meeting of these entities and the first time many of the investors had met each other. At this meeting, the first drafts of the joint venture agreements were distributed to the investors. Weiner presented the drafts. The F-D Apartments Joint Venture "ratified and approved" the accuseds' law firm as its lawyers, determining that legal services already provided and future services would be billed to the Fairway Downs Joint Venture. The joint venture agreements were not signed at this March 17, 1977, meeting. The three partners of A.P.T.S. had the responsibility of securing the signatures of the investors on the joint venture agreements, which finally was accomplished some six months later.

In October, 1980, Murrell and two of the investors in F-D Apartments Joint Venture filed a complaint with the Bar following the filing of civil litigation involving the sale of the Fairway Downs Apartment complex wherein the accuseds were, among others, named as defendants.

■ Upon these facts, we turn to the charges brought by the Bar, mindful that the accuseds are entitled to the presumption of innocence and that the charges must be proved by clear and convincing evidence. *In re Thomas,* 294 Or 505, 521, 659 P2d 960 (1983).

---

interest in the Fairway Downs Apartments initially were conceived as a "new partnership," but ultimately were denominated as "F-D Apartments Joint Venture." The third relevant entity was an umbrella joint venture that combined the A.P.T.S. partnership (40%) and the F-D Apartments Joint Venture (60%) into the "Fairway Downs Joint Venture" (100%) for the purpose of ownership, operation, and management of the apartment complex.

## Alleged Unethical Conduct

### Count I

### Violation of DR 5-105(A) and (C).[5]

In general, the Disciplinary Rules with which the accuseds are charged in this instance require that a lawyer refuse to accept or to continue employment if the exercise of independent professional judgment "in behalf of a client will be or is likely to be adversely affected," unless certain disclosure and consent requirements are met. The Trial Board concluded, and so do we, that the thrust of the Bar's charge in this count is that, because each of the three partners in A.P.T.S. (Gilbert, Murrell, and Christensen) were existing clients of the accuseds, there was a duty on the part of the accuseds to make full disclosure of the possible effect of the accuseds' representation of them.

Although it is not clear from the complaints, the Bar apparently is contending not that the legal service in forming the A.P.T.S. partnership, as such, violated the Disciplinary Rules but that the formation of a partnership of existing clients invoked the prohibition of DR 5-105(A). It thus follows that a duty of disclosure would be required under DR 5-105(C).

The question stated by the Bar on this point is: "Are DR 5-105(C) warnings regarding conflicts of interest necessary for individuals, all clients of the accused, who hire the accused to organize a partnership?" We answer the question in the negative, as did the lower tribunals, because we conclude that the formation of the A.P.T.S. partnership, involving existing clients of the firm, did not violate DR 5-105(A).

---

[5] DR 5-105(A) and (C) provide as follows:

"A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"* * * * *

"In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

Simply stated, DR 5-105(A) and (C) mandate that a lawyer must not represent conflicting interests except with express consent of all, after a full disclosure. The rationale for the rule is stated by Raymond L. Wise most recently in the 1979 Supplement to his work, Legal Ethics, at page 79:

"* * * [I]f there is the slightest doubt as to whether a proposed representation involves a conflict of interest between two clients, or between a new client and a former client, or may encompass the use of special knowledge or information obtained through service of another client * * *, or necessitates a conflict between the interests of a present or former client and those of the attorney, the doubt can best be resolved by Matthew VI, 24: 'No man can serve two masters.' * * *"

We recognize that the rule in question speaks both to an actual conflict (*will be* adversely affected) and to a potential conflict (*is likely to be* adversely affected). *In re Porter,* 283 Or 517, 523, 584 P2d 744 (1978). By reference to the legal documents prepared in the partnership formation, the Bar predicted potential conflict between the partners in the future. Also, although not charged in the complaints, the Bar pointed to the ultimate breakdown in 1980 of the earlier cordial relationship between the partners resulting in the aforementioned civil litigation. However, at the time the accuseds did the legal work and represented the clients in the formation of the partnership, there is no evidence that we could find, nor has the Bar pointed out any evidence, that suggests that there either was an existing conflict of interest or that the accuseds' independent professional judgment was or likely would be adversely affected by the employment during the years charged in the complaints. *See In re Kinsey,* 294 Or 544, 554, 660 P2d 660 (1983).

The Trial Board and the Disciplinary Review Board rested their respective conclusions that there was no violation of the Disciplinary Rules on this count on the affirmative finding of a "community of interest" among the clients at the time the partnership was created. Because we believe it provides a clearer guideline in this instance, we look to EC 5-14 (The Ethical Considerations, American Bar Association Code of Professional Responsibility):

"Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation

of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant."

See In re Banks, 283 Or 459, 475, 584 P2d 284 (1978).

Both the lower tribunals concluded that there was no evidence that the independent professional judgment of the accuseds were in any way adversely affected by the representation of the partnership. Each tribunal consequently reasoned that no DR 5-105(C) warnings were required to be given.

■ We conclude that, as to the times charged in the complaints, there is no evidence that the clients had conflicting, inconsistent, diverse, or otherwise discordant interests. We hold the accuseds not guilty of Count I.

## Count II
## Violation of DR 5-101(A).[6]

In this count, the Bar has charged the accuseds with *representing* the real estate joint venture (F-D Apartments Joint Venture) in which both had invested, without consent of all clients after full disclosure.[7] The accuseds rely on the claim that their respective interests were not sufficient to give rise to a conflict, that their own financial interests in the property were not divergent to the interests of their clients or the other investors, and that adequate disclosures and consent had been obtained.

■ We do not believe that the size or proportion of the interest of the lawyer is controlling, except to the extent that a small fractional financial interest may be less likely to affect the exercise of the lawyer's professional judgment in behalf of his client. That is not a defense, however, in and of itself.

---

[6] DR 5-101(A) reads as follows:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial business, property, or personal interests."

[7] The Bar originally charged Weiner with violation of DR 5-101(A) and (C). There is no DR 5-101(C). The Bar, the accuseds, and the lower tribunals have ignored that charge. So shall we.

■ Likewise, the fact that the financial interests of the lawyer and the client may not be divergent does not necessarily qualify as a defense or an exception to the Disciplinary Rule. However, as in the case of the size of the interest, the fact that the financial interests of a lawyer and those of his client are not divergent may establish that the exercise of the lawyer's professional judgment was not affected by his own financial interests.

■ The Bar's allegations on this count concern the employment of the accuseds by the F-D Apartments Joint Venture on March 17, 1977, and the ratification of work done prior thereto by the accuseds. From the evidence, we conclude, as did the lower tribunals, that the parties involved had been informed that the accuseds had a financial interest in the venture by whom they were employed. Although the testimony was in conflict, the Trial Board found the testimony of the accuseds and their witnesses most credible and that adequate disclosures had been made.[8] We reach the same conclusion.

## Count III
## Violation of DR 5-104(A).[9]

As a correlary to Count II, the Bar has charged the accuseds with violating DR 5-104(A) because of their *investing* in the real estate joint venture for which the accuseds provided legal service, without full disclosure to, and consent of, the clients. The thrust of the Bar's argument on this count is that the accuseds violated the Disciplinary Rule by investing in the F-D Apartments Joint Venture, which, in turn, had a financial interest in the contract held by the partnership A.P.T.S.

■ Although fraught with peril, business transactions with clients are not inherently unethical. *In re Brown*, 277 Or

---

[8] The Trial Board found that, at the March 17, 1977, meeting, the accuseds' ownership of unit interests in F-D Apartments Joint Venture had been disclosed and that the other investors were informed that the accuseds were acting as lawyers for A.P.T.S.

[9] DR 5-104(A):

"A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

121, 134, 559 P2d 884 (1977). It is when the client and the lawyer have differing interests and the client expects the lawyer to exercise his professional judgment for the protection of the client that DR 5-104(A) comes into play. Here, in the peculiar circumstances of this investment transaction, we, as did the Trial Board, conclude that the accuseds had no differing interests with the other investors or with the resulting F-D Apartments Joint Venture. Also, we conclude that there is insufficient evidence to establish that any of the investors, including the two client investors, expected the accuseds to exercise their professional judgment in the transaction for the protection of one or more of the investors. As discussed immediately below ("Count IV"), because of the nature and manner of the investment made by the accuseds, we do not find differing interests between the accuseds and their client, A.P.T.S.

We hold the accuseds not guilty of Count III.

## Count IV
### Violation of DR 5-105(A) and (C).[10]

In this count, the Bar charges the accuseds with representing a seller (A.P.T.S) and a buyer (F-D Apartments Joint Venture) in the same transaction. Since at least 1975, it has been clear that it is not proper for a lawyer to represent both the buyer and the seller in a real property transaction in the absence of express consent after a full disclosure. *In re Boivin,* 271 Or 419, 423, 533 P2d 171 (1975).

To avoid the apparent violation of the Disciplinary Rule, the accuseds raised two points: The timing of the sale predated the formation of the F-D Apartments Joint Venture and the transaction was more in the form of an investment offer and not a normal two-party real estate transaction.

The lower tribunals found, and so do we, that, at the time the individual investors subscribed to the agreements (Terms of Sale), the accuseds were representing only A.P.T.S. It was thereafter, at the meeting on March 17, 1977, that the

---

[10] DR 5-105(A) and (C), *supra,* n 5.

accuseds were retained as the attorneys for F-D Apartments Joint Venture. At that point, according to the evidence, the sale transaction long since had been completed.

■ In the typical two-party real estate transaction, the parties have many terms to negotiate, with conflicting interests. *See In re Robertson*, 290 Or 639, 624 P2d 603 (1981). In this case however, the sale by A.P.T.S. of 60% of its interest in the Fairway Downs Apartments was not that kind of transaction. It was treated by the parties as an assignment of an existing contract and there were no terms that were to be negotiated. It was characterized as "one-sided" or a "take-it-or-leave-it" deal. There is no evidence that the accuseds sought out or formed a corporate buyer *(In re Robertson, supra)* or recruited a client to invest in another client's business (*In re Brownstein,* 288 Or 83, 602 P2d 655 (1979)). The preparation of partnership and joint venture agreements following the purchase of a 60% interest does not fit under the usual two-party transaction violation covered by DR 5-105(A) and (C).

The Bar informed the Trial Board that no claim of impropriety was being made for representation of the "other entity," presumably meaning the Fairway Downs Joint Venture. This concession suggests that no claim is made in respect of the preparation of the joint venture agreements but only a claimed violation in respect of the sale.

We find the accuseds not guilty of this Count.

## Conclusion

We agree with the recommendation of the Disciplinary Review Board. ORS 9.535. The complaint of the Oregon State Bar is dismissed.