Argued and submitted September 7, 1983, accused reprimanded April 17, petition for rehearing denied May 30, 1984

In re Complaint as to the Conduct of

# MAGAR E. MAGAR,
*Accused.*

(SC 29172)

681 P2d 93

Magar E. Magar, Portland, pro se.

Robert L. Kirkman, Portland, argued the cause for the Oregon State Bar. With him on the brief was W. Eugene Hallman, Pendleton.

Before Lent, Presiding Justice, and Linde, Campbell, Roberts, Carson, and Jones, Justices.

PER CURIAM

## PER CURIAM

In this disciplinary proceeding the Oregon State Bar, by its second amended complaint, alleges nine causes against the accused of violations of the disciplinary rules of the Code of Professional Responsibility.

Causes One through Three arise out of the accused's representation of Lea Lakeside in a bankruptcy proceeding.

Causes Four through Six involve the accused's representation of Robert J. Snyder in a bankruptcy proceeding.

Cause Seven is a charge that the accused, in representing bankrupts, as a general course of conduct caused his clients to sign petitions in bankrupty and supporting schedules in blank before they had been completed and without affording the clients an opportunity to verify the accuracy of the petitions and schedules prior to filing.

Cause Eight charges the accused with misleading advertising and improper advertising regarding fees.

Cause Nine charges that the accused's conduct as alleged in the first eight charges, taken in the aggregate, establishes that the accused's actions were detrimental and prejudicial to the administration of justice, and that they adversely reflect upon his fitness to practice law.

### Lakeside Charges

The Bar charges that during the calendar year 1980 the accused was retained by Lea Lakeside for the purpose of filing proceedings under the United States Bankruptcy Code. The Bar alleges that the client was primarily concerned with obtaining relief from debts for federally guaranteed student loans from Portland Community College (PCC) and Portland State University (PSU) which were then in default. The Bar charges that the accused filed on behalf of Lakeside a petition in bankruptcy under Chapter 7 of the Bankruptcy Code, seeking to obtain a discharge of the debts for student loans, and that prior to filing the petition the accused had failed to determine whether these were dischargeable debts under the Bankruptcy Code. The Bar alleges that such conduct is a violation of DR 6-101(A)(2) which provides:

"A lawyer shall not:

"* * * * *

"(2) Handle a legal matter without preparation adequate in the circumstances."

The second cause alleges that the accused caused Lakeside to sign her petition in bankruptcy without affording her the opportunity to review the petition prior to signing.[1] The Bar charges that this conduct on the part of the accused violated the following disciplinary rules of the Code of Professional Responsibility:

"DR 1-102(A). A lawyer shall not:

"* * * * *

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

"(5) Engage in conduct that is prejudicial to the administration of justice.

"(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

The third cause concerning the Lakeside matter alleges that, subsequent to the filing of the petition pursuant to Chapter 7, the accused advised and encouraged Lakeside to deceive her creditor PCC "into believing that the bankruptcy proceedings had discharged the PCC debt, when, in fact, said debt was not discharged by the bankruptcy." The Bar alleges that this conduct was in violation of DR 1-102(A)(4) and two other disciplinary rules as follows:

"DR 7-102(A)(5) and DR 7-102(A)(7):

"(A) In his representation of a client, a lawyer shall not:

"* * * * *

"(5) Knowingly make a false statement of law or fact.

"* * * * *

"(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

---

[1] Originally the Bar charged that the accused caused Lakeside to sign the bankruptcy petition before it had been completed. At the Trial Board hearing this charge was withdrawn by the Bar.

The Trial Board found the accused not guilty on all three causes set forth in connection with his representation of Lakeside.

The Disciplinary Review Board, upon the first cause, found the defendant guilty of handling a legal matter without preparation adequate in the circumstances.

Upon the second cause, in which the accused was charged with causing Lakeside to sign her petition without affording her the opportunity to review the same prior to signing, we interpret the Disciplinary Review Board's findings to be that the accused was not guilty of that specific conduct but that he was guilty of conduct prejudicial to the administration of justice and conduct that adversely reflected upon the accused's fitness to practice law with respect to other matters in connection with the Lakeside bankruptcy which were not alleged or described in the Bar's second amended complaint. The Disciplinary Review Board found the accused not guilty of a violation of DR 1-102(A)(4), namely, conduct involving dishonesty, fraud, deceipt or misrepresentation.

With respect to the third cause concerning Lakeside, i.e., advising and encouraging the client to deceive PCC, the Disciplinary Review Board found the accused not guilty.

■■■■ As we have often stated, we make an independent review of the evidence, *In re Samuels/Weiner,* 296 Or 224, 226, 674 P2d 1166 (1983). An accused in a disciplinary proceeding is entitled to the presumption of innocence, and the charges made by the Bar must be proved by clear and convincing evidence, *In re Samuels/Weiner,* 296 Or at 228, 674 P2d at 1170. We make the following findings of fact:

(1) Lakeside was employed after finishing her education. She had a number of small debts, together with debts for federally guaranteed student loans obtained from PCC and PSU. Some of her creditors were calling her at her place of employment, and she feared that that would have an adverse effect upon her employment record.

(2) She was behind in payments due on all of her debts and considered filing for discharge in bankruptcy primarily to rid herself of the obligations for the student loans.

(3)    She telephoned to the office of the accused after seeing his advertisement featuring his bankruptcy practice in the yellow pages of the telephone directory. She was given a time to come into the office and was instructed to bring with her a list of her creditors.

(4)    When she first went to the accused's office she was interviewed by a legal assistant employed by the accused, who went over the list of creditors and advised her that the debts for student loans could probably not be discharged. The client informed the legal assistant that her primary concern was discharge of those particular debts and that she did not want to file bankruptcy unless those debts could be discharged.

(5)    The client was informed that she would have to wait until the accused was available and discuss the matter with him. The accused came a bit later to the waiting room and there discussed the matter with the client.

(6)    With respect to the student loan debts, the client explained that she had graduated from PSU in 1978, that she had borrowed funds for approximately two and one-half years while attending PSU, and for three years prior to that while attending PCC.

(7)    The accused did not ascertain from the client information sufficient to ascertain when the student loans had become due.

(8)    At that time the accused accepted from the client $200 to be applied upon fees and costs.

(9)    A few days later one of the accused's employees called the client and told her that there were forms ready to sign and that the client would have to come to the accused's office for that purpose.

(10)    The client left her own place of work late in the business day and went to the accused's office. She had a difficult time finding parking and went into the accused's office rather late in the business day.

(11)    The client did not see the accused upon that occasion. An office employee of the accused showed the client where the forms would have to be signed.

(12)   The client did not read the forms before signing, but no one prevented her from doing so.

(13)   In due course the client received a notice as to the time and place of the first meeting of creditors. She received no communication from the accused concerning that meeting.

(14)   The client went to the accused's office and was informed by office personnel that a different lawyer would be appearing with her at the meeting. The other lawyer did not appear at the accused's office, and the client then made her own way to Bankruptcy Court, having some difficulty finding it. At some time during the course of the meeting of creditors the other lawyer and the client did meet each other.

(15)   Following the meeting the other lawyer advised the client that the student loan debts were not dischargeable. As a result of that conversation the client called the accused and insisted upon being advised as to whether those debts were dischargeable. The accused at that time advised the client that they were not dischargeable.[2]

(16)   Some time later the accused wrote a letter to the client in which he stated in part as follows:

> "I have not talked to Portland Community College and I assume they have not contacted you. The reason I did not make the call is: I thought it best to let sleeping dogs remain that way. It is quite possible that the people at Portland Community do not realize that their debt may not be dischargeable and hence have not bothered you.
>
> "Your options as I see them are:
>
> "* * * * *
>
> "2.   Do nothing and keep paying on PSU debt hoping PCC will not realize their mistake if mistake it be."

Based upon the foregoing findings of historical fact, i.e., what we find to have actually occurred, we shall briefly discuss our conclusions.

---

[2] Some time subsequently the accused filed a Chapter 13 proceeding under the Bankruptcy Code, in which a plan to discharge the student loan debts at approximately 17 cents on the dollar was approved. The accused testified that this was the only manner in which the major part of these debts could have been discharged because the client did not qualify at the time she first consulted him for a hardship discharge of the student loan debts in a Chapter 7 proceeding.

## First Cause

The accused could have questioned Lakeside at the time he spoke to her in his office on her first visit to obtain information necessary to ascertain just when the student loan debts became due. If she did not then have that information readily available, he should have instructed her to obtain the information and make it known to him so as to permit him to determine whether the timing was such that the debts were dischargeable. He was aware that the discharge of those debts was the primary reason for her desire to proceed in bankruptcy. Had he ascertained the information from which the due dates for those debts could have been established, he would have had to advise her the debts were not dischargeable in a Chapter 7 proceeding in the absence of demonstration of the "hardship" exception. His conduct did constitute a violation of DR 6-101(A)(2) in that he handled a legal matter without adequate preparation.

## Second Cause

Of this charge the accused is not guilty of violation of any of the disciplinary rules alleged by the Bar in the second cause.[3]

## Third Cause

The conduct of the accused in writing to Lakeside concerning the PCC debt did not amount to advice and encouragement that she deceive PCC concerning the dischargeability of that debt. Therefore, the accused is not guilty of violation of any of the disciplinary rules charged in the third cause.

---

[3] As noted earlier in the text of this opinion, the Disciplinary Review Board found the accused guilty of violations of DR 1-102(A)(5) and (6) on the second cause, but that finding was based upon conduct that was not charged in the Bar's complaint. It is true that in older decisions of this court concerning conduct predating adoption of the Code of Professional Responsibility we have stated that we would look to the substance of charges made against a lawyer rather than treating the Bar's complaint as being in the nature of an indictment. *See, e.g., In re Reuben G. Lenske,* 269 Or 146, 158, 523 P2d 1262 (1974), and *State v. Woerndle,* 109 Or 461, 469, 209 P 604, 220 P 744 (1923). In more recent decisions, however, we have made it clear that an accused lawyer must be put on notice not only of the disciplinary rule that he is charged with violating but of the conduct constituting the violation. *See, e.g., In re Lasswell,* 296 Or 121, 128, 673 P2d 855 (1983); *In re Thomas,* 294 Or 505, 526, 659 P2d 960, 971 (1983); *In re Ainsworth,* 289 Or 479, 614 P2d 1127 (1980).

## Robert J. Snyder Bankruptcy

The fourth, fifth and sixth causes of complaint by the Oregon State Bar concern the accused's representation of Snyder.

The fourth cause in substance alleges that in August of 1979 the accused was retained to represent this client for the purpose of filing a petition in bankruptcy and that, although the accused was aware of a substantial asset of the client, the accused failed to list that asset when he prepared the client's petition in bankruptcy in December, 1979. The complaint further alleges that by reason of the accused's failure to list that asset the client was required to pay $2,500 in order to preserve his discharge in bankruptcy and in order to avoid a prosecution for perjury by the United States. The Bar complains that in addition to violations of DR 1-102(A)(4), 1-102(A)(5), 1-102(A)(6), 7-102(A)(5) and 7-102(A)(7), all set forth, *supra,* in our discussion of the Lakeside matter, such alleged conduct on the part of the accused constituted violations of other disciplinary rules of the Code of Professional Responsibility:

"DR 1-102(A).   A lawyer shall not:

"* * * * *

"(3)   Engage in illegal conduct involving moral turpitude."

"DR 7-102(A).   In his representation of a client, a lawyer shall not:

"* * * * *

"(3)   Conceal or knowingly fail to disclose that which he is required by law to reveal.

"* * * * *

"(4)   Knowingly use perjured testimony or false evidence."

"DR 7-101(A). A lawyer shall not intentionally:

"* * * * *

"(3)   Prejudice or damage his client during the course of the professional relationship * * *."

In connection with representing Snyder the Bar alleges further violations of the disciplinary rules for its fifth cause of complaint. The Bar alleges that at the time of

preparing and filing the petition for bankruptcy for Snyder the accused possessed information and documentation that would have disclosed the existence of the assets described in the fourth cause of action, but that he failed to review that information prior to preparing the petition in bankruptcy. The complaint charges that such conduct constitutes a violation of DR 6-101(A)(2) set forth above in connection with the Lakeside matter and further constitutes a violation of DR 6-101(A)(3), which provides that a lawyer shall not neglect a legal matter entrusted to him.

The sixth cause of complaint also concerns the lawyer-client relationship between the accused and Snyder. This cause alleges that the accused caused the client to sign his bankruptcy petition in blank and without affording the client the opportunity to verify the accuracy of the petition and supporting documents prior to the filing thereof. It is alleged that by so doing the accused violated DR 1-102(A)(4), (5) and (6), all set forth *supra* in connection with the Lakeside matter.

We find the facts concerning these three causes as follows:

(1)     In August, 1979, this client was contemplating proceeding in bankruptcy to discharge his debts. The client lived at The Dalles, some eighty miles from Portland where the accused maintained his regular office.

(2)     By appointment the client and the accused met on a Saturday at a motel in Estacada, Oregon, which is about 25 miles from downtown Portland and somewhat closer to The Dalles than is downtown Portland.

(3)     The client brought with him a list of his debts pursuant to instructions from the accused's office at the time the appointment was made.

(4)     Among other matters then discussed, the client told the accused in general terms of the client's remainder interest in certain real property located in The Dalles in which the client's mother had a life estate and the client and his sister were equal remaindermen. The accused expressed a rather general opinion to the client that the value of the asset would be quite speculative because anyone who was interested in purchasing it would have to take a chance that the client

would outlive his mother. The accused made no notes of this asset.

(5)     The accused gave to the client a "blank form" to take home and fill out in handwriting and instructed the client to bring the completed form and attorney fees when the client was ready to proceed.

(6)     Before the client's next meeting with the accused, the client, his co-remainderman and the life tenant effected a sale of the property, and the client received approximately $15,000 as his share. The client used a portion of this money for a down payment on purchase of land and a mobile home in The Dalles.

(7)     About four months after the meeting in Estacada, the client called the accused and told him the client was ready to proceed with the bankruptcy. He made an appointment to come to the accused's office in Portland.

(8)     The client kept that appointment and took with him the list that he had prepared on the form given to him by the accused in Estacada and took with him some of the documents concerning the closing on the purchase of the mobile home and the land on which it was located.

(9)     The accused had some conversation with the client about the value of the mobile home property and the client's equity and determined that the amount of equity was so little that under either federal or state exemption in bankruptcy the equity would be exempt.

(10)     At the same visit the information provided by the client concerning his debts was not sufficient for the accused to proceed, so the accused gave him another piece of paper indicating the kind of information he wanted with respect to each debt and instructed him to complete that information before returning.

(11)     During this visit to the office there was no discussion concerning the sale of the client's interest in the real property in The Dalles.

(12)     A few days later the client returned to the accused's Portland office with the further information which the accused had requested. The accused and the client went

over this information. They did not discuss the sale of the remainder.

(13)  The accused spoke with the client upon the second meeting at accused's office in Portland in December but was not present when the client signed the bankruptcy forms which were actually later filed.

(14)  The accused, in December of 1979, had forgotten the conversation with the client which occurred in Estacada in August of 1979 concerning the remainder interest; therefore, he made no further inquiry concerning the remainder interest in December, 1979, and the bankruptcy petition and schedules did not disclose anything concerning that asset.

(15)  The first meeting of creditors was held some months later in The Dalles, Oregon, and the accused did not attend that meeting with the client.

(16)  During the course of the first meeting of creditors the trustee asked certain questions of the client concerning taxes, and this brought out information from the client concerning the remainder interest, the sale of that interest and what the client purported to have done with the money received.

(17)  During the course of the questioning the client became panicky and made several false statements concerning the property transactions in The Dalles and the accused's knowledge and advice concerning those transactions.

(18)  Several weeks later another hearing was held at which the accused presented amended bankruptcy schedules showing the true state of affairs insofar as the accused had been able to ascertain those from the client.

(19)  The trustee in bankruptcy threatened to seek revocation of the discharge and to refer the matter to the United States Attorney for the possible prosecution of the client on perjury and false swearing charges.

(20)  The accused withdrew from further representation of Snyder, and the client thereafter retained another lawyer in The Dalles to represent the client in connection with the various matters pending with respect to the bankruptcy and the trustee's threats.

(21)   The other lawyer worked out a settlement by which the trustee accepted $2,500 from the client for the benefit of the debtor's estate and the administration thereof in return for the trustee not seeking to revoke the discharge and the discontinuance of any threatened proceedings with respect to perjury and false swearing.

(22)   For representation by the other lawyer in The Dalles the client had to pay several hundred dollars.

Based upon the foregoing facts, we turn to a discussion of the charges. We interpret Causes Four and Five essentially to be alternative charges. Cause Four charges the accused with being aware of the existence of the remainder interest and failing to include it or the proceeds of its sale in the assets of the client in the bankruptcy proceedings. Cause Five, on the other hand, charges that the accused possessed information that would have disclosed the existence of the assets had he reviewed this information prior to preparing the petition.

We conclude that neither cause is made out on the basis of the foregoing facts. Although the accused in August of 1979 was aware of the remainder interest, he had taken no notes thereof and it had slipped his mind by the time that the client came to him again some four months later. We conclude that the accused neither concealed the existence of the assets in the bankruptcy proceeding nor that he neglected a legal matter entrusted to him in failing to learn of the assets again at the time the forms were actually prepared in December, 1979.

We conclude further that the accused did not cause Snyder to sign his bankruptcy petition and supporting schedules in blank and did not deny the client the opportunity to verify the accuracy of the petition and supporting documents.

It follows that we find the accused not guilty with respect to charges contained in the fourth, fifth and sixth causes of complaint.

## General Course of Conduct

The seventh cause of complaint is that the accused has represented to the public that he is competent and qualified to practice bankruptcy law in Oregon. The Bar

alleges that as a part of his "general course of conduct" in representing bankrupts he causes his clients to sign petitions in bankruptcy with supporting schedules in blank prior to the time that the petitions and schedules have been completed and without affording to his clients the opportunity to verify the accuracy of the petitions and schedules. It is alleged that this conduct violates the following disciplinary rules, all set forth above in connection with the Lakeside matter: DR 1-102(A)(4), (5) and (6).

The Trial Board found that as a "general course of conduct" the accused does not request his clients to file bankruptcy forms in blank. The Disciplinary Review Board also found that this charge was not proven.

Upon our independent review of the evidence in this case we have already found that the accused did not cause Lakeside or Snyder to sign forms in blank. The Bar relied in part on the testimony of those two clients with respect to this charge.

The Bar also relied upon a bankruptcy proceeding for one Bainter. With respect to the Bainter matter we find as follows:

(1)  Bainter had attempted to handle a bankruptcy on a pro se basis. Eventually, he decided he needed assistance. He consulted the accused, who reviewed the necessary forms with Bainter and gave him instructions concerning the completion of the forms. Thereafter Bainter completed the forms in his own handwriting and signed them.

(2)  At a second meeting with the accused the forms and the answers were again reviewed. At that time Bainter signed blank forms. Thereafter the blank forms were completed in accordance with the information which Bainter had written on the same forms and then presented to the accused.

Based upon the foregoing facts we find that the Bar has not established by clear and convincing evidence that as a "general course of conduct in representing bankrupts" the accused causes his clients to sign petitions in blank without the opportunity to verify the information contained in the petitions, and we therefore find the accused not guilty of the charges set forth in the seventh cause of complaint.

## Advertising

For the eighth cause of complaint the Bar alleges that in the Spring of 1981 the accused placed advertisements in certain newspapers in the Portland trading area in which the accused advertised his availability for rendering legal services,

"but has failed to set forth his name in the content of said advertisements and has failed to set forth information on costs and expenses in the same size print as information on attorney fees."

The Bar alleges that this conduct violated DR 2-101(A)(1) and (2), which provide as follows:

"A lawyer shall not make any false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

"(1) Contains a material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially misleading; or

"(2) Is intended or is reasonably likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the Code of Professional Responsibility or applicable law; * * *."[4]

The Trial Board found that although the accused did place a newspaper advertisement which did not set forth information on costs in the same size print as attorney fees, this was the fault of the publisher and was contrary to the instructions given by the accused's secretary to the publisher. The Trial Board further found that although the accused intentionally did not include his name in the advertisement, the failure to do so was not "in fact misleading." The Trial Board concluded the accused was not guilty of the eighth cause.

The Disciplinary Review Board agreed that the accused was not guilty of the charge concerning the different type size with respect to fees and costs because this was not the accused's fault. On the other hand, the Disciplinary Review Board found that the accused, by intentionally failing to place his name in the ad, did violate DR 2-101(A)(1)

---

[4] We find no basis for charging, finding, holding or concluding that the accused's conduct violated DR 2-101(A)(2) and, consequently, shall not discuss that rule.

because the failure to include the name was misleading advertising within the meaning of the rule.

Little is to be gained by setting forth in detail our findings of fact with respect to the differing type sizes for attorney fees and costs and expenses in the newspaper advertisement. It is sufficient to say that we have examined the record and agree that the difference in size was because of failure of the newspaper publisher to carry out the accused's instructions. It follows that we find the accused not guilty in that respect.

With respect to this cause of complaint, we find, as conceded by the accused, that the newspaper advertisement did not contain his name and that this was intentional on the part of the accused.

Does the intentional failure to include the lawyer's name in an otherwise proper advertisement violate DR 2-101(A)(1)?

This advertisement does not contain a material misrepresentation of fact or law as such. The remaining question is whether the advertisement is false or misleading because it "omits a fact necessary to make the statement considered as a whole not materially misleading."

In order to make that decision, we draw attention to one further finding of fact we make from the evidence.

In November of 1980 the Bar had mailed to all members Opinion # 431 of the Bar's Committee on Legal Ethics. Opinion # 431 concerned "Advertising Guidelines." Opinion # 431 dealt with aspects of Disciplinary Rule 2-101. The table of contents of Opinion # 431 shows that the matter of "Names" is discussed on page 4. Turning to page 4 of the opinion, we find the following:

> "A lawyer may advertise his name and the name of his law firm, and the names and status of lawyers with whom he is associated. Any advertisement that fails to set forth the name of the advertising lawyer or law firm will be considered to be misleading and in violation of DR 2-101(A)(1). * * *
>
> "* * * * *
>
> "* * * As noted above, blind ads without the names of the lawyers or law firms are being used. This can be misleading

and can confuse the public, particularly regarding the identity, responsibility and status of the lawyer or law firm."

By the time the Opinion # 431 was circulated the accused had read Disciplinary Rule 2-101(A). The accused does not recall reading Opinion # 431 before placing the advertisement in question.

With respect to this charge the accused makes several contentions. They may be stated in substance as follows:

(1)   Accused did not place his name in the advertisement because in carrying on his practice he employs other lawyers as "independent contractors" to assist him with his overload, and he "dreads the situation where a client answering an advertisement containing accused's name absolutely insists that accused must accompany him or her to all court proceedings."

(2)   The absence of the accused's name is not in fact misleading: "No name simply means no name. It invites further inquiry."

(3)   This situation is to be compared with ads which do contain a law firm name where one responding to the ad does not in fact have an opportunity to consult with any of the lawyers whose names are in the firm name, but rather is shunted to some associate whose name does not appear at all in the ad.

(4)   A culpable state of mind in the sense of an intention to mislead must be shown in order to constitute a violation of the disciplinary rule, and no such culpable state of mind is shown by the evidence in this matter.

The Bar's contention is that it is not attempting to forbid the accused from publishing anything that actually did appear in this advertisement. The Bar seeks only to establish that a lawyer who advertises must include his name or his law firm name in the advertisement. The Bar contends that the failure to insert the lawyer's name in the advertisement makes it inherently misleading. The Bar also answers the accused's contention concerning his reason for not placing his name in the advertisement.

Concerning the accused's "dread" that a client might insist that the accused personally accompany the client to

court proceedings, the Bar accurately points out that the accused could make this clear to a proposed client who might answer the ad at the initial interview or upon the initial telephone call. This disclosure would give the client the ability to make an informed decision as to whether to enter into the attorney-client relationship or to continue it.

The Bar's main argument, however, is that the absence of a name is inherently misleading. The Bar confesses that it has been unable to find any reported decisions dealing with the legality of such a "blind ad." The Bar's contentions in its brief before this court echoes the opinion of the Disciplinary Review Board which, in pertinent part, was as follows:

> "An advertisement by a lawyer without the name of the lawyer or the name of the law firm is misleading and can confuse the public. The advertisement gives no indication of the identity, responsibility or the status of the lawyer or the law firm placing the advertisement. Blind ads can be, and often are, a tool of the unscrupulous merchant or provider of services. The identity of the lawyer or law firm who placed the ad is important, not to identify personally who may be representing the caller, but to identify the lawyer or law firm who is ultimately responsible for placing the advertisement."

The Bar's brief expands upon that idea as follows:

> "[T]he reputation of a lawyer is an important factor in the consumer's choice. In the instant case, a consumer seeing the particular ad in question would be unable, without further investigation, to make inquiry of friends or relatives as to their experience with the accused. The consumers, seeing a blind ad and without doing further investigation, would be deprived of the opportunity of checking with the Oregon State Bar concerning disciplinary matters."

Both the opinion of the Disciplinary Review Board and the Bar's argument advance cogent reasons why the disciplinary rule ought to require that the name be included in the advertisement, but the question before us is whether the rule does require the inclusion of the name. The text of DR 2-101(A)(1) does not expressly state that the failure to include the lawyer's or the law firm's name is misleading.

Neither does the text of Opinion # 431 expressly state that the omission is misleading; rather, the opinion states that the failure to include the name "will be considered to be

misleading." At least three questions are raised by use of the verb form chosen by the Committee.

(1)   Did the Committee intend a per se rule, i.e., that omission is always a violation of the rule? If so, the Committee could have simply stated that the omission is misleading instead of stating that it "will be considered" misleading.

(2)   Did the Committee intend to create a disputable presumption that such an advertisement is facially misleading and leave it to the trier of fact whether the advertisement, taken by the four corners, is in fact misleading? This would result in simply trying a charge of violation of the rule by argument confined to the four corners of the advertisement.

(3)   Did the Committee seek to create a disputable presumption that an advertisement omitting the name is misleading, thus shifting to an accused the burden of showing that in all the circumstances in which the advertisement was employed it was not misleading? This might seem the most reasonable choice for us to make as to the Committee's intention, but the further text of the opinion detracts from reaching even that result. The text states that the omission of the name "*can* be misleading and *can* confuse the public." (Emphasis added.) This is not the kind of reasoning which should give rise to a presumption. In other words, that something might possibly occur does not logically lead to declaring that it probably does occur.[5]

We interpret the rule to require that the Bar prove that inclusion of the name of the lawyer is necessary in any particular advertisement to make that advertisement as a whole not materially misleading. We think it would be rare indeed that such could be proven from the four corners of the advertisement alone. In the usual case, the Bar will have to present clear and convincing evidence that the inclusion of the name was necessary in order to save the advertisement from being misleading.

---

[5] This court is not bound by opinions of the Bar's Committee on Legal Ethics. A given opinion, however, may carry some measure of persuasion as to the correct interpretation of a disciplinary rule.

We hold that violation of DR 2-101(A)(1) has not been established.[6]

## Aggregate Misconduct

In the ninth cause the Bar charges that the aggregate conduct of the accused described in Causes One through Eight was prejudicial to the administration of justice and adversely reflects on the accused's fitness to practice law. See DR 1-102(A)(5) and (6). We have concluded that the accused was guilty of only one of those first eight charges, to-wit, handling the Lakeside bankruptcy, in the initial stage of the Chapter 7 proceeding, without preparation adequate in the circumstances.

We conclude that the charge of engaging in conduct prejudicial to the administration of justice, based upon the aggregate of the conduct charged, must fall with our not guilty findings on most of those charges.

■ The accused is guilty of violation of DR 1-102(A)(6), for a lawyer who violates a disciplinary rule of the Code of Professional Responsibility, by definition, "engages in conduct that adversely reflects on his fitness to practice law." American Bar Foundation, Annotated Code of Professional Responsibility 10 (1979).

■ This decision and the published opinion will serve as a public reprimand of the accused.

The Oregon State Bar is awarded judgment against the accused for the Bar's reasonable and necessary costs and disbursements.

---

[6] A procedure exists for establishing a per se rule for inclusion of the lawyer's or law firm's name. That procedure is embodied in ORS 9.490, a part of the original State Bar Act, Or Laws 1935, ch 28, § 12. That procedure affords to the Board of Governors, the membership of the Bar and the membership of this court an opportunity to decide whether a given policy should be adopted as a rule. By this footnote we do not foreclose our examination on the merits of any proposed rule of that nature.