Argued and submitted July 7, 1983, reprimanded and placed on probation May 1, 1984

In re Complaint as to the Conduct of

# H. KENT HOLMAN,
*Accused.*

(No. 81-94, SC 29335)

682 P2d 243

David C. Landis, Portland, argued the cause for the Accused. With him on the briefs were David R. Foster, Vicki Hopman Yates, and Landis, Aebi & Bailey, P.C., Portland.

Millard M. Becker, Portland, argued the cause for the Oregon State Bar. With him on the brief was Becker, Sipprell & Hunt, Portland.

## PER CURIAM

The Oregon State Bar complains that the accused attorney, as trustee of the "Jackson Trust," an express trust, in the approximately two and one-half year period from the late Fall of 1978 to the Summer of 1981, stole some $42,000 from the trust assets in violation of a disciplinary rule, DR 1-102(A)(4), which provides:

> "A lawyer shall not: [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

The Bar further complains that the accused commingled those funds from the trust assets with his personal funds and used the commingled funds for his own benefit in violation of another disciplinary rule, DR 9-102(A), which in pertinent part provides:

> "All funds of clients paid to a lawyer * * * shall be deposited in one or more identifiable trust accounts * * * and no funds belonging to the lawyer * * * shall be deposited therein * * *."

The Bar's complaint further asserts that the foregoing conduct of the accused violates the precepts of other disciplinary rules, DR 1-102(A)(5) and (6), which provide:

> "A lawyer shall not: (5) Engage in conduct that is prejudicial to the administration of justice. (6) Engage in any other conduct that adversely reflects on his fitness to practice law."

The accused has admitted that during the period alleged he had approximately $42,000 of the trust funds on deposit in his "office client trust account" and that he withdrew those funds. He denied that he intended to appropriate the trust property to himself and explains his conduct was caused by his addiction before and during the period in question to prescription drugs that so impaired his judgment, intellect and memory as to foreclose his knowing right from wrong in the handling of these and other funds.

### BANK OF CALIFORNIA TRUST ACCOUNT ACTIVITY FROM OCTOBER, 1978, TO SEPTEMBER, 1979

We find that on October 31, 1978, the accused's client trust account in the Bank of California had a zero balance. On November 13 he deposited in that account $50,000, which he

had received from his co-trustee of the Jackson Trust. In the next five weeks he drew a check to himself and one to his co-trustee, each for $4,000 for trustee fees, leaving a balance of $42,000.[1]

The accused deposited another client's funds in the account and during December, 1978, drew several checks related to that matter, thereby exactly exhausting those funds, so as to leave a check stub register balance of $42,000 as of December 8, 1978.

On January 19, 1979, in order to invest funds of the Jackson Trust, he drew a check to Pioneer Savings and Loan for $40,000 for purchase of a "Money Market Certificate" to mature on July 19, 1979. Both the accused's check stub and the Bank of California's records show that the remaining $2,000 was still on deposit in the client trust account.

On January 29, 1979, he drew check # 209 for $1,000 payable to himself with the face of the check indicating that it was for "Jackson Trustee Fees," but the check stub register specifies that it was for attorney fees. Apparently he received cash for that check at the Bank of California. On the same day he drew check # 210 payable to himself for $1,000 upon that account. The face of the check was for "Jackson Trustee Fees." The check stub entry, however, showed June 1, 1979, as the date of the check and that it was drawn in favor of his co-trustee for trustee fees. The check was actually deposited January 29 with First State Bank of Oregon in the accused's office account.

Commencing January 29, 1979, comparison of the check stub register and the checks themselves shows the stub register to be unreliable in determining the amounts and to whom the checks were made payable and for what purposes.

As of January 31, 1979, there was a zero balance in the client trust account at Bank of California, and this continued until June 1, 1979, when $21,450.21 was deposited therein. The check stub register would indicate that these were funds of two other trusts, one for Malkin and one for the accused's son. On that date the stub register reflected a

---

[1] The Oregon State Bar does not contend that payment of either trustee fee was unethical.

balance in the amount of the deposit. At that time there were no funds in that account belonging to the Jackson Trust.

There followed an unusual entry on the next check stub, for which we can find no rational explanation in the evidence. This stub, for check # 211, is dated June 1, 1979, states that the check is drawn to the "Lois Malkin Acct" and that the amount is $1,000. The balance shown on the stub for check # 210 of $21,450.21 is not brought forward. No deposit is indicated, and indeed none had been made; nevertheless, the stub for # 211 states a balance of $39,000 remaining in the account after deducting the $1,000 for check # 211.

In addition, the stub does not reflect accurately the details of check # 211. The check was for $1,000 as shown on the stub, but rather than being made payable to the "Lois Malkin Acct," it is payable to the accused and bears the notation that it is "For Lois Malkin Acct." It was deposited in an account at First State Bank. That bank's stamp on the check does not identify the account name or number to which the check was credited. The accused testified that the deposit was to the Malkin account at that bank.

The stub register shows that the next several checks drawn on the Bank of California client trust account during June, 1979, were drawn payable to the accused. That much and the amounts thereof were accurate; however, the accused conceded in his testimony that the purposes shown on the register for drawing those checks was not true. The register discloses dates, amounts and purposes as follows:

June 6, 1979, # 212, $2,000, "Legal Services Jackson."

June 26, 1979, # 213, $2,000, "Legal Services."

June 20, 1979, # 214, $1,000, "Legal Services Trustee Jackson."

June 20, 1979, # 215, $1,000, "Legal Services Jackson Tr."

Checks # 212, # 213, and # 215, totalling $5,000 were apparently cashed by the accused at the Bank of California. Check # 214 was deposited in the accused's office account at First State Bank.

Through the foregoing transactions the accused took money in the total amount of $7,000 from the pool made up of trust assets of the trusts for Malkin and the accused's son

during the month of June. Payment of those checks by the Bank of California reduced that account to $14,450.21 as of June 26, 1979, but because of the unexplained arithmetical addition to the stub register for check # 211 of $18,549.79, the stub register, after deduction for check # 215, showed a balance of $33,000.

The stub for check # 216 for $1,000 shows it to have been dated July 3, 1979, payable to the accused and his co-trustee for "Legal Services Jackson Trustee." The check was actually made payable to the accused alone and cashed by him at the Bank of California.

The stub for check # 217 for $4,500 shows it to have been dated July 10, 1979, payable to the accused for "Legal Services $500 Malkin 4000 Jackson." That check was cashed by the accused at the Bank of California on the date drawn.

At this point the stub register showed a balance in the account of $28,500, which, although not true, was in accord with the balance had there been as much money in the account as the register showed on stub # 211. From this point on, no stub register balance was entered as checks were drawn on the account.

On July 17, 1979, three relatively small checks were drawn in favor of tax collecting authorities for payment of sums owed by the Jackson Trust. Aside from the fact that there was no Jackson Trust money in the account, the Bar does not contend anything was amiss with these disbursements.

Chronologically, but not by stub number, we next come to the stub for check # 222. The stub indicates that a check dated July 18 for $2,000 payable to the co-trustee for "Distribution" was drawn. No matching check or bank statement entry has been brought to our attention.

On July 19, 1979, the certificate at Pioneer Savings and Loan matured, and the accused was paid $41,988.30, which he deposited in the client trust account at the Bank of California.

This brings us to stub # 221, which indicates that check # 221 was dated July 20 and drawn for $20,000 payable to the co-trustee. The stub has one entry showing the check

was for "Trustee fees" and another entry showing "remission to [co-trustee] of $20,000 for Inv-." Check # 221 was actually dated July 23, drawn payable to the accused for $1,000 and cashed on that date at the Bank of California.

On July 20, 1979, the accused resorted to the last page of his checkbook to use check # 397. The stub has no entry whatsoever. The check was made payable to the accused for $1,000, with no indication on its face as to its purpose. It was cashed by the accused on the same date at the Bank of California.

As of the end of July, 1979, the accused's client trust account at the Bank of California had been reduced to a balance of $48,522.79, when it should have had in it $63,022.79, a difference of $14,500. In other words, the sum assets of the Jackson Trust, the Malkin Trust and the trust for the accused's son had been reduced by $14,500, most of which had been taken as cash and the remainder deposited in the accused's office account at First State Bank.

When the accused came to the next page of checks (numbers 223-225) in the client trust account, for whatever reason, he apparently did not use them in numerical order. For check # 224 both the stub and the check show a date of August 15, 1979, in the amount of $1,000 payable to "Lois Malkin Trust."[2] This check was deposited at First State Bank. The deposit receipt does not identify the account to which the deposit was made, but handwriting on the receipt similar to that on the check stub states: "Lois Malkin."

The check stub for # 225 describes a check dated August 15 for $1,000 payable to the co-trustee for "Distribution." Check # 225 was actually dated August 17, payable to the Bank of California in the amount of $4,000. It appears to have been exchanged for cash.

The stub for # 223 does not show a date; it shows the check to have been drawn for $1,500 in favor of the accused for "Jackson Tr. Legal Fees." That check was dated August 24

---

[2] Interestingly, this check and those discussed earlier as being legitimate expenses of the Jackson Trust are the only ones thus far discussed on which the checks, except for signature of the accused, are typed. This check stub is in handwriting other than that of the accused. The other stubs and checks appear to have been written by the accused.

and was cashed on the same day by the accused at the Bank of California.

As of that time the account had been reduced in amount to $42,022.79. Leaving aside for the moment the $1,000 check to the Lois Malkin Trust, it would appear that the accused had now taken from the various trust funds $20,000 during the three-month period from June 1, 1979, to August 24, 1979. Of that, $2,000 had been deposited at First State Bank, and the remaining $18,000 was cash which disappeared into the accused's pocket as the proceeds from nine separate checks on the client trust account.

The stub for check # 226 indicates a date of August 20, 1979, for a check for $1,000 payable to the co-trustee for "Distribution." The check was actually dated September 7, 1979, and was payable to the accused for that amount. It was apparently exchanged for cash at the Bank of California.

The stubs for # 227 and # 228 are marked "Void."

The stub for # 229 shows a check for $2,000 dated August 30, 1979, payable to the co-trustee for "Distribution." The check was actually dated September 7, 1979, made payable to the accused and was in the amount of $41,022.79, which was the exact amount of the balance in the client trust account at Bank of California. The check was presented to that bank on September 7 and that was the last transaction on that account. Check # 229 was used to purchase a Bank of California cashier's check dated September 7, 1979, payable to the accused for that same amount. Two weeks later on September 21 he deposited $41,022.79 in his office account at First State Bank.

### UNITED STATES NATIONAL BANK
### TRUST ACCOUNT ACTIVITY FROM
### SEPTEMBER, 1979, to JUNE, 1981

On September 26, 1979, he opened a new client trust account at United States National Bank of Oregon (USNB) by a check drawn on his office account for $20,000. Oddly enough, this check is made payable to "H. Kent Holman, Client's Trust Account," an account which was not yet in existence, and was apparently accepted for deposit by USNB without any endorsement. At any rate, the accused now had a new client trust account with a balance of $20,000, an amount

at least $42,022.79 short of what should have been in a client trust account separate from his own funds.

He immediately began drawing checks upon this account, some for what appear to be legitimate purposes of the Malkin Trust and some for his own use. On September 28 he drew two $500 checks, each according to the check stub register for "Jackson Trust & Estate," each made payable to himself, one deposited to some account he had in the Bank of California and the other apparently exchanged for cash at the same bank.

The check stub entries are out of order, but apparently on November 5, 1979, he drew a check for the Lois Malkin Trust, which was presumably deposited in the proper account at First State Bank. On November 16, 1979, he drew a check for $15,000 in favor of USNB. The stub states that the amount was for "Purchase of T bills."

On November 9, 1979, the accused purchased a Treasury Bill of $50,000 and on November 19, 1979, another Treasury Bill of $30,000. We accept as true his testimony that the $50,000 bill was purchased with a combination of funds of Garretson Estate, Malkin Trust, Jackson Trust and the accused's own funds. Likewise, we accept as true that the second Treasury Bill was purchased from the combined Garretson and Malkin funds.

On November 16, 1979, the accused apparently purchased a Treasury Bill of $30,000, using the $15,000 withdrawal from his client trust fund on that date and $15,000 in the form of a check on the Garretson Estate account in First State Bank of Oregon.

We have discussed the accused's activities with respect to the funds of Malkin, the accused's son and Garretson Estate only for the purpose of presenting the full picture and to demonstrate that during the year 1979 the Jackson money disappeared from the accused's accounts.

Activity in the client trust account at USNB continued. Some of the withdrawals appear to be for legitimate purposes concerning the Malkin Trust and the Garretson Estate. Other withdrawals are such that we cannot determine whether wrongdoing was involved. At any rate, the balance in

this account was at least as low as $2,589.88 on January 14, 1980.

Following January 14, 1980, we find a record of withdrawals from the client trust fund at USNB that suggest the accused was using trust funds for his own purposes:[3]

February 4, # 112, $1,000 to the accused with no explanation on the check or the stub as to the purpose of the withdrawal.[4]

February 19, # 302 (a check taken completely out of order from the middle of the check book), $3,000 to the accused, without explanation.

February 15, # 304 (likewise out of order), $1,000 to the accused, and likewise without explanation.

March 14, # 303 (still out of order from the checks of near date, apparently drawn for legitimate purposes), $900 to the accused, without explanation.

April 18, # 130, $10,000 to the accused, apparently deposited in his office account, without explanation.

June 4, # 134, $500 to the accused, explained on the stub as "Withdrawal of Own Funds."

June 17, # 135, $5,000 to the accused explained on the stub as a withdrawal of his own funds.

July 11, # 137, $12,000 to the accused, deposited to his office account at First State Bank and, according to the stub, for "Jackson fees for IT - 22 & 706 preparation allowed by state inheritance tax referee."

July 29, # 138, $13,000 to Oregon Pioneer Savings & Loan Association.[5] The stub, on the other hand, shows that the

---

[3] During the year 1980 some rather large sums of money not detailed in the text of this opinion were deposited in the USNB account, and some large sums were disbursed for apparently legitimate purposes.

[4] Henceforth in the list the words "without explanation" will mean that we can find no explanation on either check or stub for the withdrawal.

[5] There is testimony by the accused that in purchasing the first Treasury Bill mentioned in the text he used some of his savings on deposit in Oregon Pioneer Savings & Loan Association. That institution's statements would support that testimony. The Bar argues that the accused never satisfactorily explained how he happened to have such a large amount on deposit in that savings account. The Bar argues that the amount the accused had on deposit in that account in November, 1979, may have had that part of the $41,022.79 taken from the Bank of California account in September, 1979, and not traced to the opening deposit in the USNB later that month. We cannot say that is so.

check was for $1,000 payable to the accused, without explanation as to the reason the check was drawn. The next stub for # 139 concerns the amount $13,000.

July 29, # 139, $1,000 to the Bank of California. The stub indicates a check made payable to the accused for $13,000 for "Investment."

September 12, # 144, $1,000 to the accused, without explanation.

September 17, # 145, $1,000 to the accused, deposited in his business account at First State Bank, without explanation.

September 28, # 146, $1,000 to the accused, without explanation.

September 29, # 147, $500 to the accused, without explanation.

September 30, # 148, $4,000 payable to "CASH" and not explained on the check. The stub, however, describes a $1,000 check payable to the accused without stating the purpose. The stub for # 149 (next item) speaks to a $4,000 check.

September 30, # 149, $1,000 payable to "CASH" and deposited in some account in the Bank of California. The stub describes a $4,000 check payable to the accused, but without explanation.

October 8, # 150, $1,000 to the accused, without explanation.

October 10, # 152, $500 to "CASH," without explanation.

October 24, # 153, $1,000 payable to "CASH," without explanation.

November 5, # 157, $400 to the accused, only explained on the stub as being to the accused's office account, with no statement as to the reason for withdrawal.

November 7, # 158, $1,500 to the accused, without explanation.

November 10, # 159, to "CASH," without explanation on the check as to the purpose. The stub indicates that the check was to the accused, but with no explanation of the withdrawal.

December 5, # 162, $400 to "Cash," without explanation.

December 12, # 165, $250 to "Cash," without explanation.

December 19, # 167, $1,500 to "Cash," without explanation, although the stub states the check was to the accused for office account.

We cannot find a bank statement for activity in this account for the month of January, 1981, but the statement mailed to the accused on March 3, 1981, shows a beginning balance on January 30 of $146.25. Subsequent statements show no activity in the account until June 3 when a deposit of $100, not explained in the check stub register, was made, and some small checks to various county recorders were drawn. The ending balance on the last statement we can find in the exhibits is $231.75 as of June 9, 1981.

## MEDICAL BACKGROUND

We find that the accused was admitted to practice in Oregon in 1954. He has specialized primarily in tax law and has practiced in Oregon and in California where he was also a member of the Bar.

He drafted the Jackson Trust and eventually became a co-trustee. With respect to the trust, the accused had responsibility for many of the investment decisions concerning the funds of that trust.

The accused does not deny that he took in excess of $40,000 of the funds of the Jackson Trust, commingled them with his own funds and so dissipated the funds as to be short well in excess of $40,000 in the Jackson Trust funds by the summer of 1981. As noted at the outset, he explains his conduct on the basis of addiction to prescription drugs.

With respect to the addiction to prescription drugs, we find the following to be the facts:

The accused had a condition called Esophoria which affected the muscles of one of his eyes. Since 1957 various physicians had prescribed occasional doses of Meprobamate (commonly known as Miltown) to relax the muscles of the affected eye.

In 1974 the accused came under the care of an ophthalmologist, who prescribed Valium for the eye condition. In 1975 that doctor began alternating Valium with Meprobamate.

In 1976 the accused began to see another ophthalmologist for the eye disorder, and this physician, not knowing of the other prescriptions, prescribed more Valium.

In 1977 the accused was treated by another doctor in California. The California doctor was unaware that the accused was taking Valium and Meprobamate already and prescribed both of those drugs. These prescriptions were filled in California, but the drugs were mailed to the accused on a monthly basis.

From some time in 1977 the accused was taking approximately 350 pills per month, consisting of 200 Valium at five milligrams per pill, and 150 Meprobamate at 400 milligrams per pill. It appears that this was his intake of those drugs at the time he closed his client trust account at the Bank of California.

Commencing in the winter of 1978-1979 the accused also began to drink each day nearly a full bottle of a Greek liqueur called Ouzo. His drinking bouts would last for approximately two months and then would cease temporarily, but he was drinking the same amount during the fall of 1979.

In October, 1979, a doctor in Portland referred the accused to a psychiatrist. Although the accused told the psychiatrist that he was taking Valium, the psychiatrist prescribed Elavil in some amount which is not clear in the record. Elavil is usually given to relieve depression and is an anti-depressant with sedative effects.

The psychiatrist also referred the accused to a psychologist for tests and evaluation. The psychologist first saw the accused in December, 1979, and tested the accused for the level of his intellectual ability. On standard IQ tests the psychologist found that the accused had an IQ of 99 with a performance score of 84. The psychologist arrived at a tentative diagnosis of irreversible pre-senile dementia. The psychologist was unaware at the time of this testing that the accused was taking drugs in the amounts above specified.

In January, 1980, the accused entered the hospital following a drug reaction episode. At that time it was discovered that he was suffering from toxic amounts of Meprobamate in his bodily tissues. A physician told him to stop taking the medications responsible, but no treatment plan was apparently prescribed or undertaken.

The accused's ingestion of drugs continued through 1980, although apparently at some reduced level from that obtaining prior to his hospitalization.

## DISCOVERY OF SHORTAGE IN
## JACKSON ACCOUNT

In June, 1981, the accused had formed an intent to move to California. At that time he intended to render an accounting to the Jackson Trust. Upon gross examination of his financial records by himself and his wife, he discovered that he had a shortage in the Jackson Trust funds in excess of $40,000.

He instructed his wife to call the Oregon State Bar. His wife did so, reporting the fact of the shortage to the General Counsel for the Bar. The General Counsel requested a written explanation, and this was eventually furnished by the accused's counsel in the fall of 1981.

Meanwhile, upon discovery of the shortage, the accused closed his office and completely withdrew from the practice of law in Oregon.

The accused, by liquidating his assets, has made complete restitution to the Jackson Trust in both principal and interest and has settled with the beneficiaries other claims arising out of his preparation of the trust agreement and his administration of the trust.

The foregoing are the facts as we have found them from our independent examination of the record.

## ACCUSED'S EVIDENCE

In defending against the Bar's allegations of misconduct in violation of the disciplinary rules, the accused has admitted that in September, 1979, he withdrew the funds of the Jackson Trust on deposit in his client trust account at the Bank of California and deposited those funds in his personal office account. He denies that he intended to appropriate those trust funds to himself. He concedes, however, that he did commingle his personal funds with those of the Jackson Trust. His position is that by reason of addiction to prescription drugs his intellect, judgment, cognition and memory were so impaired that he did not know what he was doing with the sums of money entrusted to him by the Jackson Trust and was

unable to appreciate that his conduct was wrongful. The accused testified that he had no recollection of drawing any of the checks upon the client trust account at the Bank of California. He testified that he was unable to explain the various entries on the check stubs as to the purpose of the disbursements, but conceded that during the time he was drawing various amounts purportedly for services to the Jackson Trust the trust did not owe him any money. He testified in similar vein concerning the disbursements from the client trust account at USNB during 1980.

He testified that by the fall of 1979 he was not only mentally affected, but was physically affected, to the extent that he had difficulty in maintaining his balance, his speech was slurred, and he had developed a tremor in his right hand.[6]

In addition to his own testimony concerning his mental condition, the accused called as witnesses the psychologist who had examined him in December, 1979, a professor of Otolaryngology and Pharmacology at the Oregon Health Sciences University, and a medical doctor who was an associate professor of Anesthesia and Pharmacology at Oregon Health Sciences University. Neither professor had been involved in the treatment of the accused during the period November, 1978, to July, 1981.

The psychologist found the accused was depressed and incoherent. He observed a "mild tremor" in the accused's right hand. The psychologist opined, upon the basis of the tests, that the accused had problems, particularly with attention and concentration and with such abilities as solving arithmetic problems or conceptual abstractions.

As noted above, the psychologist found that the accused's full-scale IQ score was 99, and he explained that this meant that in the accused's age group if 100 people's scores were taken at random, 52 would score higher than the accused did on the test and 48 would score lower. Based upon the clinical test performed, the psychologist concluded that the accused was suffering from "organic brain impairment" which

---

[6] The record does not clearly indicate whether Mr. Holman is right handed or left handed, but the psychologist noted that the right was the accused's "preferred hand." We note that his signature on all of the checks which we have discussed in this opinion give no evidence of tremor.

he equated with organic brain dysfunction. Based upon another clinical test the psychologist concluded that the accused was exhibiting a "coping style of denial," i.e., that he was expressing some "sentiment" [sentient?] sense of depression but "appeared to be trying to cope with whatever deficits he might be sensing or distress he might be experiencing through activity, through somewhat excessive activity, also a manic kind of activity." When asked for his summary the psychologist stated:

> "In summary, I stated that Mr. Holman's performance suggested gross deterioration of cognant [sic] abilities from his premorbid level consistent with a conclusion of organic brain disfunction [sic] based perhaps on a presenile dementia. His revelized [sic] [verbalized?] self concepts [sic] suggest unawareness, perhaps self denial or repression of his diminished capacities."

In addition to the testimony of the psychologist, an exhibit in the record contains his report to the referring psychiatrist. In the exhibit the psychologist opined that the accused in the past possessed "superior to very superior intellectual ability."

The professor of Otolaryngology and Pharmacology, called as a witness at the Trial Board level, had reviewed various medical reports which are in evidence as exhibits. His expert opinion was that the drugs which the accused had been taking during the period in question would produce "amnesia, may produce lapses in memory, may produce ataxia and inability to have proper motor skills so that you can't move around properly, walk properly, use your hands and fingers properly." His further opinion was that one becomes tolerant to these kind of drugs, and the only way to attain the desired effect is to take greater doses of the drug. He believed that this adds to some of the undesirable effects as far as amnesia, inability to concentrate and inability to have fine motor skills may be concerned. On the other hand, this witness agreed that a "blackout" from these drugs would be "a bits and pieces thing" but could last for as much as 12 days. When asked directly as to the effect "on a person" who was taking Valium and Miltown in the amounts this accused was doing over a period of one year, the witness expressed his opinion as follows:

> "I think he would be exhibiting a very marked inability to function. And the effects that I have described here earlier, I think are — would be the case."

The witness stated that he meant the patient would suffer from memory lapses and impairment of motor skills. The witness conceded, however, that even at this level of dosage there would be periods when the person taking the drugs could "function rationally and his memory would be normal." That testimonial concession was weakened by the witness' further opinion that the level of dosage of these kind of drugs could "make you so confused and not know what you're doing that you could certainly do something that was illegal, and not realize it."

Although this witness did not express a direct opinion on the matter, an inference may fairly be drawn from his testimony that the accused was truly addicted.

The third expert witness, the medical doctor who was associate professor at the Oregon Health Sciences University expressed the opinion, based upon his review of the medical records concerning the accused and from personally talking to the accused in preparation for the witness testifying, that in the period 1979-1980 the accused was suffering from "a sedative hypnotic drug induced reversible dementia." He stated that the effects of the use of these drugs in the quantities involved in this matter would be to impair memory, especially short-term memory. As he explained, the person's memory of things happening during the period would be more impaired than the person's ability to recall something he did as a teenager. In this respect he summarized:

> "They don't appear to lay down memory during the period of intoxication."

He opined that this kind of memory impairment would continue until such time as the drug level in the blood decreased to the point where memory could again be imprinted. With respect to such short-term memory impairment, he testified that after the drug level "went down" memory of what happened during the period of high drug blood level would not return because "it was never laid down." He further testified concerning the accused:

"I think the ability to perceive right from wrong is probably altered at the same time."

This witness testified concerning the effects of Valium and Miltown at the level of ingestion by this accused:

"I would think that one would on those levels would be able to go through the motions, would not be clinically roaring drunk, but on fine examination would have altered neurologic function, would have altered cerebella function, — these drugs profoundly affect the cerebellum and indeed his admitting history and his stay at St. Vincent's Hospital indicated profound cerebella intoxication with inability to stand with his feet together, to walk a straight line, etc. I would expect to see loss of short term memory, decreased ability to do intellectual tasks, decreased insight over what he had prior and some level of decreased judgment. In talking with Mr. Holman, he was also drinking quite heavily through this period and this would, of course, make things much more critical."

He thought that there would be a decrease in the accused's level of ability to perform intellectual tasks on the order of 50 to 75 percent. He termed this to be "very significant levels" and opined that the accused was "profoundly impaired in his intellectual ability" during the period in question.

This witness expressed as his expert opinion that during the period from July, 1979, into the summer or fall of 1980 the following:

"I feel that one could go through this indiscretion, not recognizing that indeed this was a seriously wrong act. As one could perhaps murder someone when they are drunk and not have that via [be a?] profound guilt to themselves."

When asked to be more specific about this particular accused, this witness stated that the accused's amnesia could have continued for over a year and that the accused "could" have failed to recognize or realize the wrongfulness of his conduct.

This witness was not asked to express a direct opinion on addiction, but a fair inference is that he viewed the accused to be both physically and psychologically addicted.

Two members of the Oregon Bar were called by the accused as witnesses before the Trial Board. The first lawyer was a close personal friend of the accused and of his wife. Their families in Oregon were friends. He testified that the

accused had been a first-rate lawyer prior to 1978. He testified to three incidents which he remembered in the period 1979 to 1980 in which he had observed behavior he thought was atypical of the accused. In one of these incidents they were standing together at a buffet to get food, and the accused was spilling some of his food. At dinner itself he observed that the accused "was just not with it." He implied that the other two incidents left him with a similar impression that the accused was not functioning well from a mental standpoint.

The second lawyer testified that he had been employed in the same large law firm as the accused during the last two or three years in the 1950s. The accused had been employed in the tax and business division of the firm, while the witness had been employed as a trial lawyer. Nevertheless, during the two or three years in which they were both employed at the same time by that firm, the witness had formed an opinion that the accused was a capable and intelligent lawyer, well able to carry on his practice. After 1959 the witness and the accused saw each other "from time to time." The witness did not testify as to what he might have observed upon those meetings. The witness did testify that he saw the accused at a restaurant in January, 1980. His observation as of that time was that the accused was "obviously under the influence of some medication." He characterized the accused as having a lackadaisical "I don't give a damn attitude." Because the witness had had close contact with another lawyer in the large firm and with a member of his own family who had been addicted to tranquilizers, the witness felt he was able to recognize that the accused seemed to be under the influence of some form of tranquilizer. Apparently the witness did not again see the accused until the time that the accused had become aware of the shortage in the Jackson Trust funds.

Aside from the accused's own testimony, this is the only live testimony concerning the accused's condition during the critical period.

In examining the exhibits, we have the psychiatrist's report indicating that he examined the accused and the accused's wife "at length" on October 30 and November 2, 1979. He found that the accused had a "significant but atypical depression." The psychiatrist saw both of them again on November 9, 1979, and made the following note:

"Mr. H. apparently is making clearly visible progress. He feels better and is more cheerful and self-confident. His wife has noticed him doing such things as even whistling while getting dressed in the morning, something he has not done for a very long time. They played golf a few days ago and they plan to golf again this afternoon.

"One paradox exists. The patient is fearful in my office and though very much appreciating my help at the same time he feels confused and anxious in the presence of a mental health professional. This very much goes against the grain of his previous life experiences. * * *"

The psychiatrist's note of November 28, 1979, is as follows:

"Mr. Holman continues to improve thanks to the use of Elavil. He is more active, less depressed, and in the office he is noticeably more talkative. In our first couple of meetings, he kept a lot of information to himself, but he has now disclosed that for the last 20 years he has used tranquilizers a good deal, at first meprobamate for eye twitching, and in more recent years valium. He is able to stop the medicines from time to time, but he seems largely tranquilizer-dependent because of chronic stress symptoms."

On December 7, 1979, the psychiatrist made note that he had received a call from the accused's secretary in which she requested confidentiality but expressed the opinion that the accused was no longer capable of working in the demanding field of tax law. She stated that his memory seemed to be poor, that for several months she had been "covering" for his lapses, either by doing some of the work herself or by asking other attorneys in the office to help, that she was sure the accused had been drinking at work. She recounted some rather bizarre behavior on the part of the accused at the office. The psychiatrist then noted that the accused should be referred for clinical psychological testing and later referred the accused to the psychologist who testified at the hearing.

A report from the psychiatrist to the referring doctor dated January 7, 1980, following the clinical testing by the psychologist, discloses that on December 31, 1979, the test results had been related over the telephone to the accused's wife. The report indicates that the psychiatrist at that point, by his letter, appeared to believe that the brain dysfunction found by the psychologist on testing was the result of organic

change. When the accused and his wife came into the office on January 7, 1980, the psychiatrist noted the following:

> "I was very pleased to see Mr. Holman was poised and serious but not depressed in regard to the test findings. He plans to get more help from a lawyer in his practice and to wind down and end the practice by May 1st. The importance of having another attorney to help was emphasized to the couple. He will continue to use elavil but no other medications are prescribed, and he was urged to be sure to have a good diet, to take a multiple vitamin tablet daily, and to engage in moderate exercise."

On July 31, 1981, the psychiatrist expressed the opinion that based upon his own examinations and the results of testing he believed the accused was "incapable of practicing law."

After voluntarily withdrawing from practice in July, 1981, the accused entered upon a largely self-help program of reducing his drug dependency. By November of 1981 he was no longer taking drugs. The same psychologist saw him for examination and testing in May of 1982 (about four months before the hearing before the Trial Board) and found that the accused's IQ had risen to a score of 125. As the psychologist explained, the 1979 finding some 2 1/2 years earlier of 99, although indicating a normal range of intelligence, was far below the 125 plus which would ordinarily be found in persons engaged in a learned profession. At the second testing in May, 1982, the psychologist for the first time was made aware of the accused's drug addiction. The psychologist came to an entirely different opinion; he believed that the previously found impairment was not organic but was the result of dysfunction resulting from the abuse of tranquilizers. He found no evidence of pre-senile dementia.

We find that the accused has secured employment with a foundation in California, and nothing in the record indicates that he has been using or abusing prescription drugs, or drugs of any kind, since November, 1981.

## THE CHARGES

■ Basically, the Bar has accused this lawyer of (1) stealing Jackson Trust money and (2) of commingling it with his own funds. Either charge, if established as a violation of the disciplinary rules, is sufficient to result in disbarment.

The charge of stealing is alleged to be a violation of DR 1-102(A)(4), which prohibits a lawyer from engaging in conduct "involving dishonesty." The elements are three: (1) A lawyer (2) engaging in conduct (3) involving dishonesty.

■ The accused was a lawyer. It is not necessary that he be shown to have been acting in his capacity of lawyer rather than as a trustee or in some other fiduciary relationship to the owner of the property. *In re Kenneth W. Stodd,* 279 Or 565, 568 P2d 665 (1977), concerned a lawyer who was president of a non-profit association and, in that capacity, converted the funds of the association to his own use. The opinion states:

> "Nothing less than the most scrupulous probity in dealing with the funds of others is compatible with admission to the practice of law. This is a standard that does not permit drawing a line between an attorney's professional and his non-professional roles."

279 Or at 567-68. *See also In re Warner W. Gregg,* 252 Or 174, 446 P2d 123, 448 P2d 547 (1968), where a lawyer was disciplined for embezzling the funds of an organization of which he was treasurer.

The accused certainly engaged in conduct which has been described in detail, *supra.*

■ The remaining question is whether that conduct "involved dishonesty." The grouping of the noun "dishonesty" with the other three nouns, "fraud, deceit or misrepresentation," might suggest that in order for conduct to involve dishonesty it must partake of some kind of deception in the sense of misleading the victim of the conduct. We do not so conclude. Embezzlement is dishonesty.[7] We hold that a lawyer who holds money in trust for another and converts that money

---

[7] Decisions of this court in attorney discipline cases prior to the adoption of the Oregon Criminal Code of 1971 described such conduct as embezzlement. *See,* for example, *In re Warner W. Gregg,* 252 Or 174, 177, 446 P2d 123, 448 P2d 547 (1968). The 1971 Code uses the generic term "theft" to describe criminal conduct that was formerly divided into larceny, larceny by trick, embezzlement, etc. See the Commentary to Section 122, page 131, of Criminal Law Revision Commission's Final Draft and Report, July 1970, on the proposed Oregon Criminal Code. Former ORS 165.005 made such conduct a crime and termed it "embezzlement"; moreover, that section stated, contrary to some common law definitions of embezzlement, that the fact that the defalcator had mixed the money with that of another person did not constitute a defense.

to his own use has engaged in conduct "involving dishonesty" within the meaning of DR 1-102(A)(4).

Both the Trial Board and the Disciplinary Review Board held that a "specific intent to engage in morally corrupt behavior is charged and is an essential element to a violation of DR 1-102(A)(4)," and, finding that the Bar had failed to prove such an intent on the part of the accused, found the accused not guilty of violation of the rule.

The second basic charge is that commonly called commingling. The applicable disciplinary rule is DR 9-102(A), repeated here in pertinent part for convenience of the reader:

> "All funds of clients paid to a lawyer * * * shall be deposited in one or more identifiable trust accounts * * * and no funds belonging to the lawyer * * * shall be deposited therein * * *."

In his answer to the complaint, the accused forthrightly admitted:

> "admits that in September 1979, he withdrew the [Jackson Trust] funds from his trust account and deposited the funds in his personal office account."

Throughout this matter the accused has taken the position that the disciplinary rule was not violated because of his defect of judgment, cognition and memory.

Whether DR 9-102(A) is a strict liability rule is an open question. *See In re Mannis,* 295 Or 594, 668 P2d 1224 (1983). As was the case in *Mannis,* this issue has not been directly addressed in the instant case brief and argument. The accused has not argued that commingling is not a strict liability offense. On this record we shall treat it as a strict liability offense. In *Mannis* we found the accused guilty of violation of the rule on a strict liability basis, namely, respondeat superior.[8]

---

[8] In *Matter of Rabb,* 73 NJ 272, 374 A2d 461, 464 (1977), the lawyer commingled and sought to blame an associate lawyer and a firm of accountants employed by the accused lawyer. The court said:

> "Respondent's excuse that he left the setting up of his books to a firm of accountants will not justify his practices [of failure to maintain separate accounts]. The responsibilities imposed by the disciplinary rules are personal to each practicing attorney. * * *"

This case, as presented to the Trial Board, the Disciplinary Review Board and this court, turns upon whether the accused, by reason of addiction to the medicines mentioned, did not know that he was commingling the Jackson Trust funds with his own. We shall consider the issue in that light.

The Trial Board found the accused guilty of violation of DR 9-102(A), holding that a specific intent to engage in "morally corrupt behavior" is not an element and that even an unintentional violation can result in discipline. The Trial Board found, however, that the accused at the "times stated" was "unable to appreciate that his actions were either unethical or illegal."

The Trial Board concluded that the proven conduct of the accused did not constitute a violation of DR 1-102(A)(5), prescribing conduct that is prejudicial to the administration of justice. That Board, however, found him guilty of violation of DR 1-102(A)(6), conduct adversely reflecting on his fitness to practice law, for conversion of the funds of the Jackson Trust in connection with the two checks for $1,000 each, drawn upon the client trust account near the time of investment of the $40,000 in the "Money Market Certificate." Again, the Board found that the conversion was not the result of a rational intellect because at that time the accused was not able to appreciate that his actions were either illegal or unethical.

The Trial Board's consideration of the accused's mental state is summed up in these words:

> "The compelling medical evidence presented by Accused clearly proved that the drugs taken, in the quantities consumed by Accused, could have caused memory lapses and a substantial impairment of cognitive functions, including judgment, and the trial board finds that is what happened to the Accused."

---

*In re Rude,* 221 NW2d 43, 48 (SD 1974), concerned a lawyer who had commingled and attempted to blame employees. Said the court:

> "Nor can the attorney escape censure by pleading ignorance of his financial affairs or by pointing the finger of guilt at his employees. He is bound to conduct the affairs of his office in such a manner that his client's funds are safeguarded * * *."

Those decisions imply that the rule is one of strict liability.

The Trial Board recommended a four-year suspension, commencing June 19, 1981, and thereafter until he should make a showing of fitness to practice.

The Disciplinary Review Board (DRB) concurred with the findings of fact and conclusions of the Trial Board. The DRB recommended, however, a two-year suspension to commence on the date of decision by this court.

The Trial Board held that some intent to engage in morally corrupt behavior is required to establish a violation of DR 1-102(A)(4). The text of the rule does not so state.[9]

The accused denied in his answer that he intended to appropriate the trust property to himself. In his opening statement to the Trial Board, the accused's counsel set the framework for the introduction of evidence. After reviewing the accused's professional history and his use of prescription drugs and the medical treatment (or want thereof) during the period 1979-80, counsel stated that he would call as a witness the medical doctor mentioned, *supra,* who would testify:

> "He, I think, will make an analogy between a person who is taking drugs like this and a drunk who are — your intelligence is impaired, your coordination is impaired, there is a certain amount of amnesia that is involved, and when you're withdrawing from a drug, alcohol in that case, or drugs in this case, there is no particular brain damage. There is a substantial return of brain function. And that is what we're trying to prove."

Shortly thereafter, during opening statement, a member of the Trial Board questioned the accused's counsel:

> "[Board member]: One other question I had, what standard do you think we ought to apply or do you believe we're supposed to apply to determine whether or not he was unable to appreciate the wrongfulness of his acts or what, what is the standard you're urging us to use?
>
> "[Counsel]: By 'standard,' what do you mean?

---

[9] Some disciplinary rules require intentional conduct for violation. For example, see DR 7-101(A). Some rules require a mental state described as "knowingly." See DR 7-101(A). It appears that when the rules were drafted, approved and adopted, those promulgating the rules recognized that a certain mental state would be required in some but not all.

"[Board member]: Well, are you saying that he didn't know what he was doing at all or are you saying that he knew what he was doing but didn't appreciate that it was wrong?

"[Counsel]: I think that he clearly knew what he was doing to the extent that you will see that he writes many of the checks. And you and I know that a lawyer should know that you're not supposed to commingle money. What I'm contending is that in the condition that he was in, he did not understand that he was doing wrong, that his intelligence and the other brain functions, did not tell him that he was doing the wrong thing.

"[Board member]: So, you are saying that he knew what the rule was, he just didn't appreciate the fact that he was violating it?

"[Counsel]: I think that is the way to say it.

"* * * * *

"[Counsel]: Let me just say that in my response, I don't intend to admit that Mr. Holman did anything with the kind of intent which would arise to dishonesty or illegality or criminality. What I'm attempting to, as straightforward as I can, say I appreciate that Mr. Holman wrote some of the checks and appreciate that any lawyer has to know what the rules are. But, that at that time of these events occurred, his mental situation was such that he did not appreciate that what he was doing was wrong."

At the close of the hearing the Trial Board requested a brief from both the Bar and the accused on the issue of mental impairment. The accused acknowledged that most jurisdictions addressing the issue had held that a mental or cognitive impairment constitutes a complete defense to discipline if the lawyer proves the equivalent of M'Naghten's Rule. He acknowledged that the defending attorney under the approved rule had to show that the misconduct alleged as a violation was occasioned by an impairment so that

"at the time of the committing of the act, the party accused was laboring under such a defective reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong."

In the post-trial memorandum the accused then drew the attention of the Board to *In re Sherman,* 58 Wash 2d 1, 363 P2d 390 (1961), in which Sherman was accused of making

false answers in his application for admission to practice law. The accused in that case took the position that he was not mentally responsible for what he had done. The Washington court then adopted the following rule:

> "A. Mental irresponsibility is a complete defense to conduct of an attorney which would otherwise warrant disciplinary action: (1) if such conduct was the result or the consequence of mental incompetency; and (2) if the mental condition which was responsible for such conduct has been cured so completely that there is little or no likelihood of a recurrence of the condition. *The burden of proof of this defense, in all of its aspects, is upon the respondent attorney.*" (Footnote omitted)

> "B. If the respondent attorney is able to carry the burden of proof as to his mental irresponsibility at the time of the conduct of which complaint is made, but is unable to prove recovery to the extent indicated in 'A' and the court has reason to believe that such recovery is possible, he will be suspended until such time as he can prove such recovery — otherwise, he shall be disbarred."

The accused then reviewed cases from Iowa, Illinois, Colorado, Wisconsin, New Jersey and Arizona which were to like general effect. The accused's memorandum then passed to *Hyland v. State Bar of California,* 31 Cal Rptr 329, 382 P2d 369 (1963), as standing for the rule that mental incompetency is a matter of defense.

The substance of the post-trial memorandum was repeated in the accused's brief in this court.

## DISPOSITION

In the final analysis the trier of fact must ascertain whether the accused's conduct in taking the funds from the Jackson trust and commingling them with his own was or was not the result of mental impairment by reason of prescription drug addiction to the point where the accused was unable to appreciate the wrongfulness of his conduct in taking and commingling the funds. In disciplinary proceedings this court makes its own independent review of the evidence and, upon the basis of the evidence and the entire record, must determine where the truth lies. If this court is convinced that by reason of his addiction this accused was unable to appreciate the wrongfulness of his acts, protection of the public will only

demand that he not be allowed to practice until such time as his mental impairment can be determined to be a thing of the past. On the other hand, if upon review of the entire record and the evidence this court is convinced that the accused took and commingled money at a time when· he was able to appreciate the wrongfulness of his act, he should be disbarred.

In exercising our factfinding function, we now wish to turn to some further observations concerning the evidence.

We have the direct testimony of the accused that for a period including the time from November, 1978, to the summer of 1981 his drug consumption was such that his mental capacity was so impaired that in 1982, when his deposition was taken and the matter heard before the Trial Board, he could not remember writing any of the checks or commingling the funds.

Of the healing arts practitioners who had seen him during that time, he called only one as a witness, namely the psychologist.[10] The psychologist saw him only once during the period during 1979-80, namely in December of 1979, and therefore was unable to testify as to the daily activities and appearance of the accused during the critical period.

Neither the professor nor assistant professor from the Oregon Health Sciences Center called as witnesses was able to testify directly about the accused's condition during that period for want of opportunity to observe the accused's day-to-day demeanor and capacity to perform during the critical period.

In resolving what were the facts as to the accused's degree of mental impairment and loss of memory during the period from November, 1978, through 1980, we feel one more factor must be taken into consideration. The accused did not practice in either association or partnership with other lawyers at that time. On the other hand, the lawyer in an adjoining office, Charles Carnese, was said by the accused to be the lawyer the accused knew best during this period of time. He testified that somewhat infrequently he did talk about business with Mr. Carnese. He testified that Mr. Carnese was

---

[10] He did explain that one of the treating physicians was no longer in Oregon and was uncooperative in furnishing a report.

employed by the accused as attorney for the Garretson Estate of which the accused was the personal representative. He indicated that their contacts were such during that period in late 1979 and in 1980 that Mr. Carnese and he saw each other more frequently, than had been the case in the past. Bar records show that Mr. Carnese is still practicing law in Portland.

The accused testified that through 1978 he had a secretary named Joy Clark, who was very able and with whom he necessarily had almost day-to-day association during the initial period of overuse of Valium and Miltown commenced in 1977.

He testified that after Joy Clark left his employment his secretary in 1979 and 1980, up to about March, 1981, was Joyce Hume. He testified that Joyce Hume worked for him on an independent contractor basis approximately three days per week. He further testified that Joyce Hume must have been aware of his condition and must have helped to cover for him by doing work he should have done during the critical period with which we are concerned in this case. It is apparently Joyce Hume to whom the psychiatrist referred when he stated that in December, 1979, the accused's secretary called to report to him on a confidential basis that the accused was unable to function as a lawyer. The accused and his counsel were aware that Joyce Hume had made such a report to the psychiatrist at the time that the accused's deposition and trial took place in 1982. The accused testified that he believed that Joyce Hume lived in the West Linn area, a few miles outside Portland, where the Trial Board was convened.

The accused had another part-time secretary during the critical period named Violeta Beideck. The accused neither called her as a witness nor testified as to any attempt to find her and produce her.

The accused did not call his wife as a witness despite the fact that his testimony, fairly taken, indicates that they were living together during the period in question.

The finder of fact must adjudge not only the effect of evidence, but must evaluate evidence. One of the rules which

our statute enjoins upon judges is to instruct the jury concerning the evaluation of evidence. ORS 10.095 provides that the jury is to be instructed by the court as follows:

"* * * * *

"(7) That evidence is to be estimated, not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; and, therefore,

"(8) That if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

As factfinders in disciplinary proceedings, we believe that rule for evaluating evidence should be employed by us just as it must be employed by juries in discharging their function in trying the facts of a case.

Application of the rule to the case at hand is troublesome. Charles Carnese, Joyce Hume and Violeta Beideck were persons whose testimony would be expected to shed more light on the accused's mental condition during the period from November, 1978, to July, 1981, than did that of the two lawyers whom the accused did call. On the other hand, no one owns a witness, and the Bar did not elect to call those persons.[11] The statute is a two-edged sword, for it speaks to evidence which may be either produced or contradicted. We regret that those witnesses were not called.[12]

Revisiting *In re Warner W. Gregg, supra,* we find that this court, confronted with a situation in which an attorney addicted to alcohol sought to excuse his conduct lasting over a period of several months in which he drew several checks for his own purposes and in violation of his trust, rejected Gregg's contention and evidence that during all of such times he did not know what he was doing by reason of his addiction to alcohol. This court stated:

---

[11] The accused did not call his wife, and the reason is not explained. It appears that she would have been in a better position to enlighten us as to the accused's mental condition than the two lawyers called by the accused.

[12] We do not adopt the statutory suggestion that the testimony of the two lawyers is to "be viewed with distrust."

> "The testimony of the accused was that he did not remember drawing or cashing any of the checks. He stated that when he was first questioned about the account being overdrawn he thought he had not made some deposits. When he was shown the checks he admitted he had defaulted, but said he did not previously know he had cashed them. He admitted an allegation made in the complaint that the 'financial statement previously prepared by the accused indicated that there were several hundred dollars in the bank account.' "

Without pointing to whatever evidence was convincing to this court in that case, the court concluded:

> "However, he knew what he was doing when he cashed at least some of the checks and before the association officials questioned him he was aware that he had committed defalcations."

We have characterized the first cause alleged in the Bar's amended complaint as being one of stealing Jackson Trust money. We did so because the language chosen by the Bar is in terms much like the language employed in the Oregon Criminal Code of 1971 to define the crime of "Theft." The Bar charges that

> "the accused, with intent to appropriate said trust property to himself, took and withheld the same from the owners or beneficial owners thereof."

ORS 164.015 provides:

> "A person commits theft when, with intent * * * to appropriate property to himself * * * he:
>
> "(1) Takes * * * or withholds such property from an owner thereof; * * *."

No doubt the accused took and withheld the property of the Jackson Trust; the issue is whether he had the requisite intent to appropriate the property to himself.

Just as in a criminal prosecution for theft, or for that matter in a civil cause for the tort of conversion, the burden of proof stays with the plaintiff on the elements of the cause. The evidence of the taking and use of the money in this case would surely be enough for a prima facie case, that is, to take the plaintiff beyond a motion for judgment of acquittal or involuntary dismissal. That is because a reasonable inference may be drawn as to the element of intent.

A plaintiff, by establishing a prima facie case, does not necessarily win the case. The factfinder may decide not to draw that inference necessary to plaintiff's success. Especially is that so when the defendant produces evidence which, if believed, tends to disprove the existence of the element of intent.

 This proceeding is neither civil nor criminal in nature but is sui generis, ORS 9.529 (formerly ORS 9.535(6)). The Bar has charged that, in taking and withholding the money from the beneficial owners, the accused acted with a specific intent. We hold that the burden of persuasion on that element is on the Bar and does not shift. The burden of producing evidence is on the Bar and did not shift in this case, for the Bar did not produce such evidence of intent that the Bar would have been entitled to prevail as a matter of law. Compare OEC 305 and 307.[13] Nevertheless, the accused did produce evidence, and this court must weigh all of the evidence in order to determine if it is highly probable that the accused had that requisite intent.[14]

As we have previously noted, there is sufficient evidence to permit an inference that the accused had the necessary intent to make him guilty. Arrayed against that predicate evidence, however, is not only the accused's own testimony but that of the expert witnesses as to his addiction and the expected results and trappings of such addiction, but also the strong circumstantial evidence of the manner in which the check stub register and the checks themselves differed.

 The evidence raises such doubt in our collective

---

[13] OEC 305 provides:

"A party has the burden of persuasion as to each fact the existence or nonexistence of which the law declares essential to the claim for relief or defense the party is asserting."

OEC 307 provides:

"(1) The burden of producing evidence as to a particular issue is on the party against whom a finding on the issue would be required in the absence of further evidence.

"(2) The burden of producing evidence as to a particular issue is initially on the party with the burden of persuasion as to that issue."

[14] The requirement that the Bar prove its case by clear and convincing evidence requires evidence that makes it highly probable that the facts asserted are true. *Cook v. Michael,* 214 Or 513, 525-528, 330 P2d 1026 (1958).

minds that we cannot say that it is highly probable that the accused had the intent to appropriate any Jackson Trust money to himself. We find the accused not guilty on the first charge, stealing Jackson Trust money.

The accused concedes that commingling occurred; therefore, we find that the accused violated DR 9-102(A) as charged. *Cf In re Mannis, supra.*

The evidence produced by the Bar would permit an inference that the accused either intentionally or knowingly commingled Jackson Trust money with his own by failing to keep the funds in separate bank accounts. Again, however, we cannot say that it is highly probable that on any one occasion of commingling the accused did appreciate that his conduct was a violation of that disciplinary rule.[15]

By its amended complaint, the Bar also charged that the accused's conduct as described in the charges of stealing and commingling was prejudicial to the administration of justice and adversely reflected upon his fitness to practice law. DR 1-102(A)(5) and (6). Consistent with our findings on the first two charges, we find that the accused's conduct was not prejudicial to the administration of justice, but that it does reflect adversely on his fitness to practice law.

Violation of another disciplinary rule is, by definition, a violation of DR 1-102(A)(6). *In re Magar E. Magar,* 296 Or 799, 681 P2d 93 (1984). In addition, however, the accused's addiction to drugs is conduct which adversely reflects upon his fitness to practice law. Not only did his addiction adversely reflect upon his fitness, it vitiated his fitness to practice law.

Arguing that he had overcome his addiction, the accused has suggested that "structured probation" is all that is warranted for the protection of the public. We have found, however, that the accused is guilty of violation of DR 9-102(A) and of DR 1-102(A)(6). We conclude that sanction beyond probation is necessary.

This opinion will stand as a public reprimand to the accused. *In re Mannis,* 295 Or 594, 668 P2d 1224 (1983), *In re*

---

[15] We do not mean to say that the accused must be shown to have been actually aware of the provisions of the rule; every lawyer is charged with notice of the contents of the disciplinary rules.

*Magar, supra.* In addition, we conclude that a structured probation is necessary for protection of the public; therefore, we place the accused on probation until July 1, 1987, and thereafter until such time as the accused can persuade this court that the probation should be terminated. *See In re Varnes,* 285 Or 463, 468, 591 P2d 366 (1979).

The terms of probation shall be as suggested by the accused:

(1) The accused shall be retested for drug use monthly at the accused's expense in such manner and place as shall be fixed by the Oregon State Bar.

(2) The accused shall consent to the testing person or agency reporting the results of testing directly to the General Counsel of the Oregon State Bar. The General Counsel may disclose each and every report to such expert as he may designate to assist the General Counsel in evaluation of the report.

(3) The accused, at his expense, shall submit to semi-annual examination for mental impairment by a physician or psychologist, or both, selected by the General Counsel, and shall arrange, at the accused's expense, that the selectee report directly to the General Counsel the results of the examination.

We order that during the period of probation the accused may be suspended summarily from the practice of law upon motion of the Oregon State Bar, supported by affidavit containing evidence that the accused's mental condition is such that his suspension is desirable to protect the public.

It is further ordered that the Oregon State Bar is hereby awarded judgment against the accused for the Bar's actual and necessary costs and disbursements and expenses in this matter. ORS 9.536(4).