No. 64,946

In The Matter of LAVONE A. DAILY, *Respondent.*

(804 P.2d 993)

Opinion filed January 18, 1991.

*Stanton A. Hazlett,* deputy disciplinary administrator, argued the cause and was on the brief, and *Bruce E. Miller,* disciplinary administrator, was with him on the formal complaint for the petitioner.

*Michael A. Barbara,* of Topeka, argued the cause and was on the brief for the respondent.

*Per Curiam:* This is a contested attorney disciplinary matter. A complaint was filed against LaVone A. Daily by her stepdaughter, Martha J. Bartlett. After investigation, the office of the disciplinary administrator filed a formal complaint.

The panel that heard the complaint found that Daily had violated DR 1-102(A)(3), (4), and (6) (1990 Kan. Ct. R. Annot. 165), and DR 9-102(B)(1) and (4) (1990 Kan. Ct. R. Annot. 204). The panel recommended that Daily be indefinitely suspended from the practice of law.

Daily filed exceptions to the report, findings, and recommendations of the hearing panel.

We adopt the hearing panel report and recommendations.

### Facts

LaVone A. Daily was married to Kansas attorney William Scott for 15 years. Daily and Scott practiced law together in the firm of Scott and Daily, Chartered. Scott was killed in a pedestrian traffic accident on January 23, 1986, at a time when Daily and Scott were attending a seminar in Florida. Although Daily did not view the initial collision, she heard the impact and witnessed the extensive and severe crushing injuries suffered by Scott.

The complainant, Martha J. Bartlett, is Scott's daughter. Highly summarized, the complaint alleges that, by deceit and trick, Daily caused Bartlett to endorse a draft representing life insurance proceeds payable to Bartlett as beneficiary. Daily is alleged to have deposited the draft in her personal account.

This matter came on for hearing before a hearing panel of the Kansas Board for Discipline of Attorneys on July 25, 1989. Daily requested a continuance, stating that her defense would be prejudiced because there was a civil case pending against her. (*Martha J. Bartlett v. LaVone A. Daily,* case No. CV 87-17679, Jackson County, Missouri.) The panel denied the request. At the hearing, Daily offered to stipulate to the Disciplinary Administrator's evidence. However, the Disciplinary Administrator introduced evidence and called witnesses for the benefit of the panel and of the court.

Daily handled certain matters regarding life insurance proceeds to be paid as a result of Scott's death. Some of the proceeds came from the Veterans Administration. In addition, there were proceeds from a $25,000 policy issued by Imperial Casualty and Indemnity Co. (Imperial).

On March 5, 1986, approximately six weeks after Scott's death, Daily wrote to Imperial requesting a claim form. In that letter, Daily referred to herself as the principal beneficiary of the policy. On March 10, 1986, an Imperial representative responded requesting further proof of claim. This response stated that Martha J. Bartlett was the beneficiary.

On March 13, 1986, Daily wrote to Imperial enclosing the requested proof of claim. In the March 13 letter, Daily again referred to herself as a beneficiary and requested immediate attention. On March 17, 1986, Imperial sent a letter to Daily and enclosed a draft for $25,000. The Imperial letter again stated that Martha J. Bartlett was the beneficiary. The draft was made payable to "Martha J. Bartlett, Daughter of William E. Scott."

Daily had previously received two checks from the Veterans Administration. The checks were payable to Martha Bartlett and were in the amounts of $2,545.57 and $2,546.50. After Daily told Bartlett about the Veterans Administration checks, Bartlett went to Daily's office, picked up the checks and signed a receipt for the checks on a Veterans Administration form attached to the checks.

Daily contacted Bartlett in April 1986 and said that she (Daily) needed Bartlett to sign another receipt for the Veterans Administration checks. Daily said the government wanted the receipt. Bartlett was told to come to Daily's house to sign the receipt.

Bartlett went to Daily's house. The receipt was on the table and Bartlett signed it. Bartlett noticed that the receipt was stapled at the bottom with carbon paper under the original. Bartlett thought it was strange that the receipt was on plain paper with no letterhead.

Sometime after signing the receipt, Bartlett called Daily's office. Bartlett talked to a secretary who asked how much money Bartlett had received from her father's estate. Bartlett answered that she had received $5,000 from two Veterans Administration checks. The secretary then asked to meet with Bartlett.

The secretary testified that she had become suspicious of what had happened to the $25,000 Imperial draft. The secretary had typed the March 5, 1986, and March 13, 1986, letters from Daily to Imperial. She had also seen the responses from Imperial. The secretary said the draft came to the office. She had noticed that Daily's letter referred to Daily as beneficiary while the letters from Imperial listed Bartlett as beneficiary. The secretary had asked Daily if Daily had the matter straightened out as far as who the beneficiary was. Daily responded yes. The secretary located a photocopy of the Imperial draft from an office file pertaining to Scott's death. The copy had Martha Bartlett's signature on it.

The secretary met with Bartlett and showed Bartlett a copy of the draft. Bartlett said that her signature was on the draft, but she had never seen the draft before.

Bartlett called Imperial and requested a copy of the draft. When she received the copy, she noticed that Daily's signature was also on the draft.

Bartlett went to Daily's home to talk to Daily about the draft. Daily was not home so Bartlett used her own key to enter the home. Bartlett discovered a file marked "Bartlett Farm." In the file, Bartlett found the receipt she had signed for the Veterans Administration checks. She noticed that her signature appeared on the original but did not appear on the carbon copy. Bartlett then determined that Daily had placed the draft under the carbon in such a manner that when the receipt was signed, Bartlett's signature was transferred to the endorsement line of the draft.

Dan L. McCarty, a forensic chemist and documents examiner, confirmed this determination.

Bartlett confronted Daily with the draft. Daily told Bartlett that the secretaries handled these matters and that she would check into it. A few days later Daily gave Bartlett a cashier's check for $25,000 dated May 19, 1986.

The $25,000 Imperial draft had been deposited in a personal account owned by Daily at Sun Savings in Kansas City, Kansas. At the time of the original deposit, only Bartlett's endorsement was on the draft. Because the draft was being deposited in an account held by someone other than the payee, a bank employee called Daily and told her that she had to endorse the check. The check was then endorsed by Daily and deposited in her account.

Bartlett explained why she reported this incident to the Disciplinary Administrator. She went to a Kansas attorney to handle her dispute with Daily over ownership of a farm. They discussed the check incident. The attorney told her that when the facts were brought out in court, the incident would have to be reported and that he could be in trouble for not turning in the ethical violation. Bartlett stated: "And they were on me for quite a while to do it. I had to—it took a lot of thought and a lot of heartache to come to the conclusion that it had to be done. In fact, it took about a year."

Daily did not testify or address the panel. The Disciplinary Administrator introduced a letter written by Daily to the attorney of the local Wyandotte County Bar committee investigating the complaint. Daily's letter stated that a secretary, Gloria Jordan, took care of all matters regarding Scott's death. This letter also stated that Daily was told the $25,000 draft was "inadvertently deposited" in Scott's savings account at Sun Savings. Daily also alleged that whatever Bartlett needed to sign was signed at the office and that she had not represented Bartlett in any manner. The Disciplinary Administrator also introduced a portion of Daily's deposition taken in unrelated litigation. In the deposition Daily denied under oath any knowledge of how Martha J. Bartlett's signature was placed on the draft or how the draft was deposited in Daily's personal account at Sun Savings.

Judge Herbert Walton, Judge Harry Miller (retired), and attorney J. Donald Lysaught testified on behalf of Daily. Judge Walton testified that he has known Daily since they were classmates in law school. Daily graduated from law school in 1957.

Daily has practiced in Judge Walton's court. Judge Walton stated that Daily has a reputation as a good lawyer and a good reputation for truthfulness and veracity. Judge Walton's opinion of Daily concurs with her reputation. Judge Walton testified that he was only generally familiar with the allegations in the complaint. He had no knowledge of the evidence.

Judge Miller testified that he had known Daily since 1965. She had been in his court numerous times. He stated that Daily has a good reputation as a lawyer. His personal opinion is that she is an able, competent lawyer. Judge Miller was not familiar with the allegations in the complaint.

J. Donald Lysaught is a member of the Kansas Bar. He has known Daily since she was six years old as he grew up in the same neighborhood. He testified that he has never heard any criticism of her integrity or ethical standards. His personal opinion is that she is fit to practice law and is a woman of integrity and honesty.

Daily requested a continuance so that she could be evaluated by a psychologist. The continuance was granted.

The hearing reconvened on February 23, 1990. Daily had been evaluated by a psychologist, Marilyn A. Hutchinson, Ph.D. Dr. Hutchinson testified that Daily suffered post-traumatic stress disorder (PTSD), resulting from witnessing Scott's death, with a high probability of some beginning stages of organic brain decline which was exacerbated by stress. She further testified that, if Daily did the acts alleged in the complaint, Daily did so in a dissociative state and that the act was not intentional or willful.

At the request of the Disciplinary Administrator, Daily was examined by Dr. Herbert Modlin, a psychiatrist at the Menninger Foundation. Dr. Modlin testified that, in April and May 1986, Daily had probably suffered from PTSD, mild presenile dementia, and depression. He disagreed with Dr. Hutchinson's opinion that Daily was in a dissociative state at the time the alleged acts occurred. Modlin stated that a dissociative state is a sudden acute experience in contrast to the alleged acts in the present case which required planning and occurred over several weeks. He stated that a more likely explanation is that Daily suffered from "amnesia after the fact." Modlin stated that this occurs when someone who is reasonably moral is appalled by what they have

done, so they block it out to come to grips with their own conscience. He stated that it could have been that Daily did not want to steal the money but that she just did not think Scott would have wanted Bartlett to have it.

The panel unanimously concluded on clear and convincing evidence that:

"1. The respondent has violated D.R. 1-102(A)(3), (4) and (6) by fraudulently inducing the complainant to endorse a check which the respondent converted to her personal use.

"2. The respondent has violated D.R. 9-102(B)(1) and (4) in failing to promptly cause the insurance proceeds to be paid to Martha Bartlett."

The panel further found that neither Daily's physical nor mental condition excused her violation. Such factors, if proven, are mitigating factors. The panel found the psychological and psychiatric evidence furnished "little to mitigate the respondent's scheme to defraud her stepdaughter." The panel did find three mitigating factors: (1) Restitution was made; (2) there is an absence of previous violations; and (3) there is evidence of Daily's good character by testimony of a prominent lawyer and two judges.

The panel noted that Daily refused to address the panel, thus, depriving it of information as to her present attitude. The panel noted the only evidence in that regard is: (1) Daily's letter to the attorney of the local bar committee stating "she inadvertently deposited" the draft; and (2) her statement under oath in her deposition in which she denied any knowledge of how Bartlett's signature got on the draft. The panel recommended that Daily be indefinitely suspended from the practice of law.

Daily takes exception to panel findings 18, 19, 20, and 21:

"18. It is the opinion of Dr. Hutchinson that 'if' the respondent induced the fraudulent endorsement, she did so in a disassociative state without intent or purpose as a result of a post traumatic stress disorder induced by her husband's violent death.

"19. It is the opinion of Dr. Modlin that it is most unlikely the respondent fraudulently induced Ms. Bartlett to endorse the check in a disassociative state because the fraud required planning and took place over an extended period of time. The panel credits Dr. Modlin's testimony.

"20. Dr. Modlin also testified, and Dr. Hutchinson concurred, that the respondent suffers mild pre-senile dementia which is described as an organic brain disease, minimal in nature which may cause depression and other overlapping symptoms with post traumatic stress disorder.

"21. Because no other act of the respondent evidences any mental or organic disease consistent with aberrational behavior, such as the commission of a crime, the panel finds the psychological and psychiatric testimony of little help in resolution of the issues of this case. Following her husband's death, the respondent has practiced law actively and competently. It is clear that William Scott intended Martha Bartlett to be a beneficiary of the Imperial Life insurance policy because he designated her as the beneficiary and never changed that designation. The respondent's suggestion to her psychologist, therefore, that Mr. Scott really did not want Ms. Bartlett to have the money is inconsistent with the action of a competent, practicing attorney such as Mr. Scott. Moreover, from the evidence there appears to have been no recognition of nor treatment of either a psychological or organic problem by the respondent or those around her until well after this hearing had commenced."

## Clear and Convincing Evidence

The panel found that Daily violated DR 1-102(A)(3), by engaging in illegal conduct involving moral turpitude; 1-102(A)(4) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; and 1-102(A)(6) by engaging in conduct that adversely reflects on her fitness to practice law, Supreme Court Rule 225 (1990 Kan. Ct. R. Annot. 165); and DR 9-102(B)(1) by failing to promptly notify client of receipt of funds and 9-102(B)(4) by failing to promptly deliver funds the client was entitled to receive, Supreme Court Rule 225 (1990 Kan. Ct. R. Annot. 205).

Daily does not deny that the Disciplinary Administrator proved by clear and convincing evidence that Daily did the acts alleged. Nor does she contend that the acts do not constitute violations of the sections of the Code of Professional Responsibility cited above. Daily argues that the conduct was caused by mild organic brain dysfunction exacerbated by PTSD and that the evidence negates any willful, intentional act to deceive. Daily contends that the Disciplinary Administrator failed to prove by clear and convincing evidence that Daily had specific intent to fraudulently induce complainant to endorse the draft.

The Disciplinary Administrator argues that the panel concluded that the psychological and psychiatric testimony was of little help in resolving the issues of the case. The disciplinary adminstrator argues that Daily carried out a planned, devious course of action which took place over an extended period of time, March 5, 1986, to May 19, 1986, and that the nature of the conduct could

only be intentional. The Disciplinary Administrator's arguments have merit.

Daily cites *In re Holman,* 297 Or. 36, 682 P.2d 243 (*En Banc*) (1984). In *Holman,* the accused attorney was a trustee to a client's trust. He withdrew funds from the trust account and deposited those funds in his personal office account, commingling his personal funds with those of the trust. He then dissipated the funds such that the trust was approximately $40,000 short. During this time, the attorney was addicted to prescription drugs and alcohol. He began seeking psychological help. The attorney examined his financial records and discovered the $40,000 shortage. He instructed his wife to call the Oregon State Bar, closed his office, and withdrew from the practice of law. A professor of Otolaryngology and Pharmacology testified that Holman could have failed to recognize the wrongfulness of his act. The professor who testified did not know the attorney at the time of the misconduct.

Holman testified that his mental capacity was so impaired that he did not remember writing the checks or commingling the funds. This was the only evidence as to his mental condition at the time of the violations. The court noted that the bar failed to call witnesses who could have contradicted this testimony. See 297 Or. at 65. Thus, the Oregon Supreme Court held that the bar did not bear its burden to prove specific intent in taking and withholding money from the trust. See 297 Or. at 67.

Daily argues that both Dr. Hutchinson and Dr. Modlin agreed that Daily did not have willful, deceitful intent. Dr. Modlin's testimony is unclear. First, he stated that this is not a case of malingering. Then he agreed that, in other words, this is not a case of willful deceitful intent. Malingering means to pretend incapacity. Webster's New Collegiate Dictionary 696 (1973). Thus, it is not clear if Dr. Modlin meant that Daily did not have willful, deceitful intent to pretend incapacity or meant that Daily did not have willful, deceitful intent to deceive or defraud Bartlett. Dr. Modlin did testify that it could have been that Daily may not have wanted to steal the money but that she just did not think Bartlett should have it. This indicates that she might not have intended to steal but did *intend* to keep the money from Bartlett. In his report, Dr. Modlin states:

"The planned *deliberateness* of the check endorsement incident over a period of time argues against some kind of attack or spell. The incident is puzzling since it is at such variance with her lifestyle and her prior ethical legal and personal conduct. The patient knew Scott was temporarily angry with his daughter and did not want her to have the farm. She could have extrapolated from that to decide Scott would not have wanted Martha to get the insurance proceeds either." (Emphasis added.)

Neither Dr. Hutchinson nor Dr. Modlin knew or examined Daily until the fall of 1989, over three years after the alleged acts took place. The panel specifically noted that no other act of Daily's evidences any mental or organic disease consistent with this aberrational behavior. Additionally, the panel noted that there was no recognition or treatment of any mental or organic problem until well after the hearing commenced.

In *State v. Martin,* 231 Kan. 481, 646 P.2d 459 (1982), the respondent attorney testified that he was mentally and physically unfit to practice law at the time of the misconduct. We reasoned that personal misfortune of the attorney is a mitigating factor if such misfortune has contributed to violation of the code of professional responsibility. In *Martin,* we observed that mitigating factors will not excuse a violation and are to be considered only when determining the nature and extent of discipline to be administered. 231 Kan. at 486. See Annot., Mental Or Emotional Disturbance As Defense To Or Mitigation of Charges Against Attorney in Disciplinary Proceeding, 26 A.L.R.4th 995.

The Disciplinary Administrator proved that Daily implemented a detailed plan. She sent letters to Imperial naming herself as beneficiary. Her secretary specifically asked her whether she had cleared up who the beneficiary was. She created a device which caused Bartlett to unknowingly endorse the draft. She deposited the money in her personal account, which required a second trip to Sun Savings to endorse the draft. These acts occurred over a ten-week period. Dr. Modlin stated that these acts were deliberate. The nature of this conduct could only be intentional.

During oral argument, counsel for respondent was asked by a member of this court if Bartlett knew of the Imperial policy. Counsel responded that she did not. If the secretary had not alerted Bartlett, the carbon paper fake receipt deception might have remained undiscovered.

The Disciplinary Administrator has proven with clear and convincing evidence that Daily violated DR 1-102(A)(3), (4), and (6), and DR 9-102(B)(1) and (4).

### Indefinite Suspension

The panel unanimously recommended that Daily be indefinitely suspended from the practice of law. Daily argues that this discipline is too severe.

The panel found that Daily's conduct was covered by ABA Standards for Imposing Lawyer Sanctions § 5.1 (1986) which states:

"Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:

5.11 Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

This court has stated the factors to be considered in assessing punishment in attorney discipline cases: (1) whether restitution has been made; (2) previous violations or absence thereof; (3) previous good character and reputation in the community; (4) the present or past attitude as shown by his/her cooperation during the hearing and acknowledgment of the violation; (5) support from friends and members of the bar; (6) any statement by complainant expressing satisfaction with restitution made and requesting no discipline; and (7) personal misfortune of the attorney if such misfortunes have contributed to violation of the code. *Martin,* 231 Kan. at 486.

The panel found mitigating factors.

The panel seemed to be disturbed that Daily had failed to address the panel. Daily did not acknowledge the violation or

show her present attitude regarding the violation. We are also disturbed by the absence of such acknowledgement.

The panel noted that the only evidence in the record in regard to Daily's present attitude is the letter to an attorney of the local bar committee investigating the complaint and her deposition testimony taken in unrelated civil litigation.

In the deposition Daily denied any knowledge of the incident. The panel states in the Final Hearing Report that Daily contends in the letter she " 'inadvertently deposited' the check." The letter actually states: "I was told, after it was brought to my attention, that as part of the estate matter, a draft from Imperial Casualty & Indemnity Company was inadvertently deposited in a passbook savings account . . . ."

The panel did not consider the psychological testimony as a mitigating factor. The panel credited Dr. Modlin's testimony that it was unlikely that Daily fraudulently induced Bartlett to endorse the draft in a dissociative state. The panel did not find that Daily's personal misfortunes contributed to the violation. We agree with the panel.

We conclude the Board's recommendation that respondent be indefinitely suspended from the practice of law is appropriate.

IT IS THEREFORE ORDERED that LaVone A. Daily be and she is hereby indefinitely suspended from the practice of law in the State of Kansas.

IT IS FURTHER ORDERED that LaVone A. Daily shall forthwith comply with Supreme Court Rule 218 (1990 Kan. Ct. R. Annot. 155).

IT IS FURTHER ORDERED that this order shall be published in the official Kansas Reports and that the costs of this action be assessed to the respondent.

Effective this 18th day of January, 1991.